IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NICOLE L. OLDHAM, | ) | CIVIL ACTION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. |
| | ) | |
| DIVISION OF STATE POLICE, | ) | |
| DEPARTMENT OF SAFETY & | ) | |
| HOMELAND SECURITY, | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| Defendant. | ) | |

## COMPLAINT

1.      This is a civil action arising from sex discrimination and retaliation which seeks compensatory and punitive damages and declaratory and injunctive relief for a female Police Sergeant of the Delaware State Police who was sexually harassed in a hostile work environment, physically assaulted, involuntarily transferred to the jurisdiction where her brother had been found dead on the side of the road less than two years earlier, forced out on medical leave, and involuntarily separated from employment by Defendant all because of her sex and in retaliation for her complaints of sex discrimination in violation of Title VII of the Civil Rights Act of 1964, and the Delaware Discrimination in Employment Act.

## I. JURISDICTION AND VENUE

2.      The jurisdiction of this Court is invoked pursuant to 28 *U.S.C.* §§ 1331 and 1343;  42 *U.S.C.* § 1981a; and Title VII of the Civil Rights Act of 1964, as amended, 42 *U.S.C.* § 2000e et seq. ("Title VII").

3.      The causes of action arise under Title VII and the Delaware Discrimination in Employment Act ("DDEA").

4.      This Court has supplemental jurisdiction over the state law claims under the DDEA pursuant to 28 *U.S.C.* § 1367.

5.      All conditions precedent to jurisdiction have occurred or have been complied with.  Plaintiff filed a timely administrative complaint with the United States Equal Employment Opportunity Commission ("EEOC").  All administrative proceedings have been terminated.  The EEOC issued Plaintiff by mail a Notice of Right to Sue dated March 2, 2021.  She files this Complaint within 90 days of receipt of such Notice.

6.      Venue is proper in this district because it is the judicial district where Plaintiff was employed, the unlawful employment practices and the discrimination complained of occurred, and the claims arose.

## II.  THE PARTIES

7.      Plaintiff Nicole L. Oldham is a female.

8.      From July 2002 until December 31, 2018, Plaintiff was employed by the Defendant Delaware State Police as a police officer, most recently in the rank of Sergeant.

9.      At all times material hereto, Plaintiff was a diligent, honest, and loyal employee who always performed her job in an exemplary manner.

10.     Defendant Division of State Police, Department of Safety & Homeland Security, State of Delaware is an agency of the State of Delaware.

11.     At all times material hereto, Defendant had over 500 employees.  Defendant is a covered employer under both Title VII and the DDEA.

2

### III. <u>FACTS GIVING RISE TO THE ACTION</u>

**A.      Plaintiff's Excellent Employment History (2002-2018).**

12.      Initially in July 2002, Plaintiff was a Recruit Trooper.

13.      Plaintiff was voted her Academy Class President in 2002.

14.      Plaintiff was Defendant's first female Academy Class President.

15.      Then, Plaintiff graduated from the Police Academy and earned a promotion to Trooper in or around July 2001.

16.      Plaintiff subsequently earned a promotion to Trooper First Class in or around July 2003.

17.      Plaintiff subsequently earned a promotion to Corporal in or around July 2006.

18.      From her Academy Class, Plaintiff was the first officer assigned to a special unit.

19.      From her Academy Class, Plaintiff was the first officer promoted.

20.      Plaintiff was a 2004 Trooper of the Year nominee.

21.      Plaintiff earned the Governor's Excellence, the Firearms Excellence, the Lifesaving Excellence, and the Lifetime DUI/MADD Awards.

22.      In May 2007, Plaintiff became the first and the only female ever selected to be a Fatal Investigator in Defendant's Collision Reconstruction Unit ("Fatal Unit").  To earn that assignment, Plaintiff achieved a perfect score on the Institute of Police Technology and Management exam.

23.      In July 2011, Plaintiff earned a promotion to Sergeant.

24.      From July 2011 to January 2013, Plaintiff was the supervisor of Troop 7's D Shift.

25.     In January 2013, Plaintiff was selected for the Governor's Executive Protection Unit ("EPU").  The mission of the EPU is to protect the Governor, his Lieutenant Governor, and their families.

26.     From January 2013 to November 2016, Plaintiff was assigned to the EPU.

27.     Plaintiff became the first woman named EPU's Officer in Charge based on merit.

28.     From November 2016 to February 2018, Plaintiff was the supervisor of Troop 4's B Shift.

29.     In Troop 4's B Shift from November 2016 to February 7, 2018, Plaintiff supervised the 2016-2017 Trooper of the Year.  That trooper received the award due in part to Plaintiff's tutelage.

30.     On her latest evaluation on or about February 15, 2018, Plaintiff's supervisor Lieutenant Mentino DiSilvestro rated her performance as Consistently Exceeds Expectations. This was the second highest of five possible ratings.

31.     From July 2002, through October 2017, Plaintiff received virtually no written discipline.

**B.    Continuing Pattern of Harassment of Plaintiff Because of Her Sex (2002-2018).**

32.     Throughout Plaintiff's employment, Defendant engaged in a continuing pattern of harassment of Plaintiff because of her sex from 2002, through December 31, 2018.

33.     Early in Plaintiff's career, then male Trooper Steve Symk circulated an e-mail falsely claiming that Plaintiff conducted a stop with Plaintiff's child in her car and was car jacked.

34.      Symk wrote this "FEMALE trooper" should not be on the job and indicated he

was reporting these lies to help out his "brothers" in the DSP.

35.     Symk received a talking to but no discipline.

36.     Though Symk's conduct constituted unlawful, sex-based harassment in the workplace, Defendant told Plaintiff to drop it.

37.     From 2002 to approximately July 2011, Plaintiff reported at least three (3) subsequent incidents of harassment by Symk to her superiors including Sergeant Ken Hardy and Sergeant Barry Dean.

38.     Sergeant Hardy forwarded Plaintiff's complaints up the chain of command to Plaintiff's Lieutenants and Captains including Lieutenant Ron Hagan and most recently, Captain John Yeomans.

39.     However, Sergeant Dean mocked Plaintiff and encouraged Symk's harassment of Plaintiff.

40.     Defendant, Captain Yeomans, Lieutenant Hagan, and Sergeant Dean took no further action against Symk.  Defendant told Plaintiff to just steer clear of Symk because this is how he is and he will just continue to bother Plaintiff.

41.     Also, many times after she returned from vacations between June 2001, and approximately 2007, Plaintiff's vehicle had flat tires, equipment missing, or lubricant on the door handles and steering wheel.

42.     Plaintiff's mailbox also was vandalized with derogatory stickers and pictures.

43.     Plaintiff reported these acts of vandalism to her vehicle and mailbox to Sergeant Hardy and her subsequent supervisors.

44.     From 2002 to approximately May 2007, Sergeant Hardy forwarded Plaintiff's

complaints up the chain of command to Plaintiff's Lieutenants and Captains including Lieutenant Hagan.

45.     However, Defendant took no further action to investigate or address the vandalism directed toward Plaintiff.

46.     Plaintiff produced arrest numbers higher than some male detectives doing criminal work 24 hours per day and 7 days per week.  However, senior, male officers told Plaintiff to slow down because her arrests caused less productive males to fall below the Troop average.

47.     Again, in May 2007, Plaintiff became the first and the only female ever selected to be a Fatal Investigator in Defendant's Fatal Unit.

48.     Beyond one generic class on death notifications in the Academy, Defendant gave Plaintiff no additional victim service training to deliver death notifications in the Fatal Unit.

49.     Yet, Defendant provided additional victim service training to Troopers in the Victim Services Unit.

50.     In the Fatal Unit, Defendant and Sergeant Barry Dean required Plaintiff to deliver more death notifications and investigate more child fatalities than her male peers in the Fatal Unit.  Defendant and Dean ordered Plaintiff to make death notifications that were not part of the call out procedure.  However, Defendant and Dean did not order Plaintiff's male peers in the Fatal Unit to go outside of the call out protocol to make death notifications.

51.     Defendant and Sergeant Dean also assigned Plaintiff to provide more death notifications of child fatalities than her male peers were assigned.

52.     Rather than assigning her only to deaths of strangers, Defendant and Sergeant

6

Dean often assigned Plaintiff to provide more death notifications for the deaths of individuals whom she knew personally than her male peers in the Fatal Unit.

53.     For example, Dean ordered Plaintiff to stand in the blood of her close, personal friend, Georgetown Police Officer Chad Spicer, when he was murdered.

54.     By way of further example, Dean ordered Plaintiff to perform an in-person identification of her close friend who was the wife of Corporal Bill Matt.  In so doing, Dean shook the bloody face of her corpse at Plaintiff and then dropped the body toward the ground before Plaintiff caught the lifeless body.

55.     Then, Dean ordered Plaintiff to search the vehicle for Corporal Matt's two-year old son.  Dean purposely concealed the fact that the son already had been removed from the vehicle.

56.     In contrast, Defendant and Sergeant Dean assigned her male peers to provide death notifications mostly for the deaths of strangers.

57.     Sergeant Dean assigned Plaintiff to so many fatalities and death notifications that he mockingly referred to Plaintiff as "The Death Cloud." Her male peers in the Fatal Unit also called Plaintiff "The Death Cloud."

58.     Defendant's Executive Staff was aware of the inequitable amount of death notifications, child fatality investigations, and more unpleasant death notifications that Sergeant Dean assigned to Plaintiff compared to her male peers.

59.     However, Defendant and its Executive Staff took no action to correct the disparate treatment of Plaintiff compared to her male peers.

60.     Plaintiff earned certification and re-certification as a Krav Maga law enforcement

instructor which were paid for with Defendant's training funds.  Defendant allowed Plaintiff to teach these defensive tactics to other law enforcement agencies.

61.     However, Defendant prevented Plaintiff from teaching defensive tactics to Defendant's Troopers.  Yet, Defendant and Captain Galen Purcell permitted lower ranking males, including Trooper Ricardo Torres to teach defensive tactics to Defendant's Troopers.

62.     At Troop 4, there were approximately just eight (8) members each in the female led A and B shifts while the male led C and D shifts each had ten (10) members.

63.     This lowered proactive patrol time for and increased overtime requests from Plaintiff's understaffed B shift.

64.     Plaintiff informed Lieutenant John McColgan, Captain Rodney Layfield, and other males of this understaffing.  She asked for each shift to have an equal number of members.

65.     However, Defendant took no action to correct the imbalance favoring Plaintiff's male, peer Sergeants and their shifts.

66.     In the EPU, Plaintiff requested the same free housing benefit in New Castle County ("NCC") given to her male peers.

67.     In response, male Lieutenant Michael J. Wysock told a male Sergeant, "She can suck my dick."

68.     When Plaintiff refused, she was required to pay $500 monthly to live with a NCC homeowner.  However, Plaintiff's male peers in the EPU 1) were given free use of NCC houses or 2) were allowed to live in Sussex County and receive pay to commute.

69.     For example, Plaintiff's male peer, Trooper Andy Goode, was allowed to commute from Sussex County and was paid overtime for his commuting time.

8

70.     Receiving pay to commute was and still is against Defendant's Standard Operating Procedures.

71.     Defendant presently pays male members of the EPU to commute.

72.     When Plaintiff was selected for the EPU, male troopers placed a photo and a message in her mailbox falsely claiming that Plaintiff performed oral sex on Delaware's Speaker of the House to gain the prestigious EPU job.

73.     In or around November 2016, Sergeant J.B. Mitchell created and spread unlawful, sexually harassing, false rumors 1) that Plaintiff was reassigned from the EPU to Patrol because Plaintiff had been sleeping with males while on duty and 2) that once re-assigned to Patrol, Plaintiff worked on the road (rather than at a desk) in order to have sex with co-workers while on duty.

74.     Plaintiff confronted Sergeant Mitchell about his unlawful, sexually harassing, false rumors.  However, he later laughed about the fact that she confronted him, and he continued to spread these unlawful, sexually harassing, false rumors about her.

75.     Plaintiff reported Mitchell's unlawful, sexually harassing, false rumors about her to Captain Rodney Layfield.  Layfield told Plaintiff that she needed to have thicker skin and not let what someone else said about her bother her.  Layfield never addressed Sergeant Mitchell formally about his unlawful, sexually harassing, and false rumors.

76.     Instead, Layfield joked about Mitchell's unlawful, sexually harassing, and false rumors about Plaintiff to Plaintiff's male peers and her lower ranking, male co-workers.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

**C.      Retaliation and More Harassment of Plaintiff Because of Her Sex (2016-2018).**

**i.      Threat of Discharge and Transfer to Least Productive Shift.**

77.      After Plaintiff reported the sex-based harassment for years and ongoing overtime fraud in the EPU, Defendant did not address either.

78.      Unable to stop and unwilling to participate in the fraud, Plaintiff requested a transfer from the EPU in or around October 2016.

79.      In response, Major John R. Evans, a male, told Plaintiff, "This is a career ender."

80.      In November 2016, DSP transferred Plaintiff to Troop 4's least productive shift: B Shift.

**ii.     Physical Assault of Plaintiff's Breasts.**

81.      On or about November 14, 2017, male Lieutenant John McColgan unfairly criticized Plaintiff's subordinate for passing on an unrequired warrant execution in the daytime.

82.      The next day, McColgan and Plaintiff heatedly disagreed about the competence of her shift and Plaintiff.

83.      After Plaintiff defended her shift, McColgan put both of his hands on both of her breasts and forcefully pushed Plaintiff out of his office.

84.      However, McColgan has not pushed any male Sergeants.

**iii.    False Accusations of Misconduct: Insubordination and Conduct Unbecoming an Officer.**

85.      On November 15, 2017, male Captain Rodney Layfield falsely accused Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to McColgan.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

### iv.     Visual, Sexual Harassment.

86.     In a meeting with Layfield, McColgan, and DiSilvestro, McColgan leaned back in his chair, grabbed his crotch, obscenely gestured toward Plaintiff, and told Plaintiff, "Don't flatter yourself."

87.     When McColgan's two (2)-day long harassment finally drove Plaintiff to tears, Layfield told Plaintiff, "I am worried about your mental health."

88.     In contrast, Plaintiff previously reported to Layfield that Trooper Andy Partyka had become drunk, tried to break into his girlfriend's house, expressed that he did not want to live, and sent his girlfriend a picture of himself with his gun in his mouth.  In response, with Sergeant Mitchell present, Captain Layfield merely told Partyka not to have contact with his girlfriend and Partyka's suicidal ideation would remain in-house.

89.     Sergeant Mitchell harassed Plaintiff for reporting Partyka's suicidal ideation to Captain Layfield.

90.     Plaintiff reported Mitchell's harassment to Layfield.  Layfield took no action against Mitchell.  Layfield again told Plaintiff not to let what other people said about her bother her.

91.     On or about November 22, 2017, McColgan had DiSilvestro unfairly write up Plaintiff for Failure to Arrest when an Arrest Was Warranted despite the fact that the domestic abuse victim did not want to press charges.

92.     Further, none of Plaintiff's male peer Sergeants at Troop 4 even handled domestic abuse incidents, took paper complaint calls, or worked with their shifts from the 911 calls all the way through the arrests like Plaintiff did.

11

### v.   Alteration of Job Responsibilities: Involuntary Transfer of Plaintiff and Her Shift.

93.   At all times material hereto, it was DSP's custom not to transfer senior officers unless they requested it.

94.   Yet, in late 2017, Layfield transferred Plaintiff's entire shift except her male assistant from her.

95.   Then on January 29, 2018, Layfield violated policy by calling Plaintiff on vacation and prematurely told Plaintiff that he was transferring her to Troop 5, effective March 4, 2018.

96.   Troop 5 was the Troop farthest from Plaintiff's home.

97.   Troop 5 is in the same jurisdiction where Plaintiff's brother was found dead on the roadside on July 4, 2016.

98.   Defendant has not involuntarily transferred any other Sergeant from patrol without disciplinary action.

99.   Though Plaintiff was the most senior Patrol Sergeant in Sussex County, Defendant involuntarily transferred Plaintiff on or about January 29, 2018.

### vi.   Replacement of Plaintiff With Less Experienced Male.

100.   Defendant replaced Plaintiff at Troop 4, with a brand new Sergeant, a male.

### vii.   More False Accusations of Misconduct, False Rumors, and Disclosure of Private Facts.

101.   On February 7, 2018, Plaintiff's doctor ordered Plaintiff on medical leave indefinitely for Stress and Depression.

102.   On February 9, 2018, Plaintiff e-mailed her doctor's note to Defendant.

103.   On February 9, 2018, Captain Layfield acknowledged by e-mail Plaintiff's

12

medical leave and that Human Resources also was made aware.

104.    Yet, Layfield attacked Plaintiff more with false accusations of misconduct and false rumors.

105.    After hours, at approximately 5:30 p.m., Layfield texted a copy of Plaintiff's doctor's note intended for a person unauthorized to receive it.

106.    In a second text, Layfield falsely accused Plaintiff of using the services of a "diet doctor."

107.    In a third text, Layfield falsely claimed that he was notifying Headquarters. Earlier, he admitted that he already had done this.

108.    Layfield also illegally disclosed that Plaintiff was out for mental issues to a Troop 5 Lieutenant.

109.    This Lieutenant was not in Captain Layfield's chain of command.

110.    This Lieutenant had no right to know Plaintiff's private medical information.

111.    Layfield's acts violated Defendant's privacy policy.

112.    Layfield's acts constituted Conduct Unbecoming an Officer.

113.    Defendant allowed its male troopers to spread false rumors about Plaintiff that she was not at work because Plaintiff "lost her mind."

114.    These false accusations, false rumors, and public disclosure of private facts injured Plaintiff's professional reputation.

**D.    Forced Medical Leave & Involuntary Separation from Employment (2018).**

115.    Defendant forced Plaintiff out on medical leave on February 9, 2018.

116.    Between approximately February 9th and December 31st, 2018, Defendant

13

terminated Plaintiff's e-mail access to its e-mail system and deleted all of her e-mails without her consent.

117.    In contrast, Defendant does not terminate its male Troopers' e-mail access to its e-mail system until after they retire.

118.    Defendant's Standard Operating Procedures allow Troopers in need of additional leave time to solicit and receive additional, unused leave time from their co-workers.

119.    However, between approximately February 9th and December 31st, 2018, Defendant prohibited Plaintiff from soliciting and receiving additional, unused leave time from her co-workers.

120.    On October 31, 2018, DSP's Colonel Nathaniel McQueen, Jr. informed Plaintiff in writing that Defendant was separating her from employment effective December 31, 2018.

121.    Plaintiff remained on leave until December 31, 2018.

122.    On December 31, 2018, Defendant and McQueen separated Plaintiff from employment with Defendant.

123.    On December 31, 2018, Plaintiff's employment with Defendant ended.

**E.    Workplace Composition.**

124.    Currently and at all times material hereto, Defendant employs approximately 716 sworn police officers.

125.    Currently and at all times material hereto, Defendant employs approximately ninety (90) female police officers.

126.    Currently and at all times material hereto, Defendant employs approximately 626 male police officers.

14

## IV.  INJURIES AND DAMAGES

127.    As a result of the discriminatory treatment she experienced, Plaintiff is suffering

from severe emotional distress which is or has been marked by insomnia; vomiting; extreme

weight loss; lack of focus and mental errors in everyday life; feelings of despondency and

depression; social anxiety and lack of social interaction; loss of interest in leisure activities; loss

of intimacy; feelings of agitation, irritability, and anger with herself and others; flashbacks;

nightmares; weight gain; and crying.

128.    Plaintiff has been required to pay for medical visits and medications for which she

otherwise would not have been required to pay.

129.    As a direct and proximate cause of Defendant's actions, Plaintiff has suffered

the decreased benefits of employment, lost wages, decreased employment and earnings

opportunities, reduced pension, lost life insurance, and other lost benefits; medical expenses;

humiliation, embarrassment, injury to reputation, severe emotional distress; and other pecuniary

and non-pecuniary losses and permanent injuries.

## V.  OTHER ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

130.    The actions of the Defendant were deliberately, intentionally, willfully,

purposefully, and knowingly done in violation of federally protected rights.  Defendant either

knew or showed a negligent or reckless disregard for the matter of whether its conduct violated

federal and state law rights.  Its actions were outrageous and taken with evil or improper motive,

in bad faith, out of personal animus, or motivated by bias and without any reasonable grounds to

support them.  Its actions were wanton and malicious or taken with reckless indifference to rights

protected under federal and state law.  Plaintiff's sex and/or protected activity made a difference

in all actions adverse to her.  Plaintiff's sex, and/or protected activity was a motivating or determinative factor in all actions adverse to her.

## VI. CLAIMS

### COUNT I
### HOSTILE WORK ENVIRONMENT (SEX - TITLE VII AND DDEA)

131.    Plaintiff repeats and realleges all paragraphs set forth above.

132.    Because of her sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected her, and it would do so for a reasonable person of the same sex in her position.

133.    The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a female worker.

134.    The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

135.    Under all the circumstances, Plaintiff has been illegally discriminated against in the terms and conditions of her employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of sex.

136.    Plaintiff's statutory right to be free of sex discrimination has been denied under Title VII and the DDEA.

### COUNT II
### INVOLUNTARY TRANSFER (SEX - TITLE VII AND DDEA)

137.    Plaintiff repeats and realleges all paragraphs set forth above.

138.    Plaintiff is a female.  Defendant discriminated against and involuntarily

16

transferred her to Troop 5, on January 29, 2018, effective March 4, 2018. There is a causal connection between Plaintiff's sex and Defendant's discrimination. Any non-discriminatory reason given by Defendant is a pretext for sex discrimination.

139.    Any stated legitimate non-discriminatory reason offered by the Defendant for its actions is a pretext for intentional discrimination based on sex. Any reason offered by Defendant is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that Defendant did not act for the asserted non-discriminatory reason.

140.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was Plaintiff's sex. In the alternative, any reasons provided by the Defendant for the treatment of Plaintiff are pretextual and a cover up for sex discrimination.

141.    Plaintiff's rights were violated under Title VII and the DDEA, because she was disciplined or otherwise discriminated against on the basis of her sex.

142.    Plaintiff's statutory right to be free of sex discrimination has been denied under Title VII and the DDEA.

## COUNT III
## INVOLUNTARY TERMINATION OF EMPLOYMENT (SEX - TITLE VII AND DDEA)

143.    Plaintiff repeats and realleges all paragraphs set forth above.

144.    In or around October 2016, Defendant and Major Evans threatened that Plaintiff

could be discharged.

145.    On January 29, 2018, Defendant and Captain Layfield altered Plaintiff's job responsibilities by transferring Plaintiff to Troop 5, effective March 4, 2018.

146.    On November 15, 2017, Defendant and Captain Layfield issued Plaintiff unsatisfactory job evaluations or falsely accused Plaintiff of misconduct by falsely accusing Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to Lieutenant McColgan.

147.    Defendant knowingly permitted conditions of employment which were so intolerable that a reasonable person subject to them would be forced out of work.  Plaintiff was forced to go out on medical leave.  The sole reason that Defendant knowingly permitted these conditions of employment was Plaintiff's sex.

148.    On December 31, 2018, Defendant separated Plaintiff from employment and involuntarily terminated her employment.

149.    As a direct and proximate result of the discriminatory treatment she experienced, Plaintiff is suffering the injuries and damages listed in section IV above.

150.    Plaintiff's statutory right to be free of discrimination because of sex has been denied under Title VII and the DDEA.

**COUNT IV**
**INVOLUNTARY TRANSFER IN RETALIATION**
**FOR OPPOSING ILLEGAL PRACTICES (SEX - TITLE VII AND DDEA)**

151.    Plaintiff repeats and realleges all paragraphs set forth above.

152.    Plaintiff opposed practices made illegal by Title VII and the DDEA.  Defendant retaliated against her for her opposition and involuntarily transferred her to Troop 5, on January

18

29, 2018, effective March 4, 2018.  There is a causal connection between Plaintiff's opposition and Defendant's retaliation.

153.    Any stated legitimate non-retaliatory reason offered by the Defendant for its actions is a pretext for retaliation for opposing discrimination based on sex.  Any reason offered by Defendant is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that Defendant did not act for the asserted non-discriminatory reason.

154.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was Plaintiff's protected activity.  In the alternative, any reasons provided by the Defendant for the treatment of Plaintiff are pretextual and a cover up for retaliation and sex discrimination.

155.    Plaintiff's rights were violated because she was disciplined or otherwise discriminated against in retaliation for opposing illegal practices and on the basis of her sex.

156.    Plaintiff's statutory right to be free of retaliation for opposing sex discrimination has been denied under Title VII and the DDEA.

**COUNT V**
**INVOLUNTARY TERMINATION OF EMPLOYMENT IN RETALIATION**
**FOR OPPOSING ILLEGAL PRACTICES (SEX - TITLE VII AND DDEA)**

157.    Plaintiff repeats and realleges all paragraphs set forth above.

158.    In or around October 2016, Defendant and Major Evans threatened that Plaintiff could be discharged.

19

159.    On January 29, 2018, Defendant and Captain Layfield altered Plaintiff's job responsibilities by transferring Plaintiff to Troop 5, effective March 4, 2018.

160.    On November 15, 2017, Defendant and Captain Layfield issued Plaintiff unsatisfactory job evaluations or falsely accused Plaintiff of misconduct by falsely accusing Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to Lieutenant McColgan.

161.    Defendant knowingly permitted conditions of employment which were so intolerable that a reasonable person subject to them would be forced out of work.  Plaintiff was forced to go out on medical leave.  The sole reason that Defendant knowingly permitted these conditions of employment was Plaintiff's complaints of sex discrimination.

162.    On December 31, 2018, Defendant separated Plaintiff and involuntarily terminated her employment.

163.    As a direct and proximate result of the discriminatory treatment she experienced, Plaintiff is suffering the injuries and damages listed in section IV above.

164.    Plaintiff's statutory right to be free of retaliation for her complaints of discrimination because of sex has been denied under Title VII and the DDEA.

**WHEREFORE**, Plaintiff prays that the Court grant the following relief:

A.    Enter a declaratory judgment declaring the actions of Defendant to be violations of federal and state law;

B.    Issue a permanent injunction requiring Defendant to expunge Plaintiff's personnel files of any derogatory, false, or misleading information relating to this matter;

C.    Award damages in an amount to be determined at trial for lost salary, back pay

and front pay, including all incremental pay increases that Plaintiff would have received;

> D.      Award damages for reduced pension;

> E.      Award damages for lost life insurance and other lost benefits;

> F.      Award compensatory damages for the $500 monthly rents Plaintiff was required

to pay to live with a NCC homeowner while she was assigned to the EPU;

> G.      Award compensatory damages for out-of-pocket medical expenses;

> H.      Award compensatory damages for emotional distress, humiliation,

embarrassment, and injury to reputation;

> I.      Award punitive damages under Title VII and the DDEA;

> J.      Award reasonable attorney's fees, costs, and pre-judgment and post-judgment

interest against Defendant; and

> K.      Require such other and further relief as is equitable, just, and proper.

**LaROSA & ASSOCIATES LLC**

*/s/ John M. LaRosa*
**JOHN M. LaROSA, ESQ.**
Delaware Bar No. 4275
1225 King Street, Suite 802
Wilmington, DE 19801-3246
(302) 888-1290 (telephone)
(302) 655-9329 (fax)
JLR@LaRosaLaw.com

*Attorney for Plaintiff Nicole L. Oldham*

Dated: June 1, 2021

Attorney Files/John's Files/Client Files/Oldham/D.Del./Complaint