IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE L. HANTZ, )
f/k/a NICOLE L. OLDHAM, )
)
   Plaintiff, )
)
  v. )  C.A. No. 21-801-RGA
)
DIVISION OF STATE POLICE, )
DEPARTMENT OF SAFETY & )
HOMELAND SECURITY, )
STATE OF DELAWARE, )
)
   Defendant. )

**PLAINTIFF'S ANSWERING MEMORANDUM**
**IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

**LaROSA & ASSOCIATES LLC**
**JOHN M. LaROSA, ESQ.**
Delaware Bar No. 4275
1225 King Street, Suite 802
Wilmington, DE 19801-3246
(302) 888-1290 (telephone)
(302) 655-9329 (fax)
JLR@LaRosaLaw.com

*Attorney for Plaintiff Nicole L. Hantz*

Dated: September 13, 2021

## PROCEDURAL BACKGROUND

Plaintiff Nicole L. Hantz filed her Charge of Discrimination with the United States Equal Employment Opportunity Commission (Ex. A, "Charge"), on October 27, 2018; her original Complaint (D.I. 1), in this Court on June 1, 2021; and her First Amended Complaint (D.I. 5, Ex. B, "FAC"), on July 14, 2021.  Defendant filed a Motion to Dismiss (D.I. 7), and a supporting memorandum with argument (D.I. 8), on August 30, 2021.  This is Plaintiff's Answering Memorandum in Opposition to Defendant's Motion.

## STANDARD OF REVIEW

"To survive a motion to dismiss, a complainant must plead facts sufficient to show that a claim has 'substantive plausibility.'" *Wooten v. City of Wilmington*, 2021 WL 411707, at *3 (D. Del. Feb. 5, 2021) (Andrews, J.) (quoting *Johnson v. City of Shelby*, 574 U.S. 10, 12 (2014)). "That plausibility must be found on the face of the complaint." *Martinez v. Delaware State Police*, 2016 WL 6902451, at *4 (D. Del. Nov. 23, 2016) (Andrews, J.) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* "Deciding whether a claim is plausible will be a 'context-specific task that requires the reviewing court to draw on its judicial experience and common sense.'" *Id.* at 679.

## STATEMENT OF FACTS

I.    **Hostile Work Environment (2002-2018).**  From July 2002 until December 31, 2018, Plaintiff was employed by the Defendant Division of State Police, Department of Safety & Homeland Security, State of Delaware ("DSP") as a police officer, most recently as a Sergeant.

FAC at ¶ 8. Throughout her employment, Defendant engaged in "a continuing pattern of harassment of Plaintiff because of her sex from 2002, through December 31, 2018." *Id.* at ¶ 32. The harassment included the following:

    **A.**    **Non-Discrete Acts Over 300 Days Before the Charge Filing (2002-2017).**

1. Vandalism of Plaintiff's patrol vehicle, mailbox, and uniform hat between June 2001 and approximately 2007, (*id.* at ¶¶ 41-43);

2. Trooper Steve Smyk's false e-mail that Plaintiff conducted a stop with her child in the car and was car jacked in 2002, and three other incidents of harassment by him from 2002 to approximately July 2011, (*id.* at ¶¶ 33-37);

3. Disparities in death notifications and other harassment from Sergeant Barry Dean beginning in May 2007, (*id.* at ¶¶ 52-59, 62, 64);

4. The sexually harassing photo and message that Plaintiff gave oral sex to Delaware's Speaker of the House to gain her prestigious job in the Executive Protection Unit ("EPU") around January 2013, (*id.* at ¶ 83);

5. Lieutenant Michael Wysock and Colonel Nathaniel McQueen's denial of Plaintiff of the free housing benefit provided to male officers in the EPU from January 2013 to November 2016, (*id.* at ¶¶ 75, 77);

6. Defendant's prevention of her from teaching defensive tactics to its troopers in April and May 2014, (*id.* at ¶ 67);

7. Sexual advances and harassment by Corporal Jim Rossi when Plaintiff was in the EPU from January 2013 to November 2016, (*id.* at ¶¶ 91-109);

8. Major John Evans' threat that Plaintiff's career would end when she requested a transfer from the EPU in October 2016, (*id.* at ¶¶ 119-20);

9. Sergeant J.B. Mitchell's false rumors around November 2016, that she was reassigned from EPU because she slept with her male subordinates and now worked on the road to have sex with other male subordinates, (*id.* at ¶ 84);

10. Captain Rodney Layfield's understaffing of the female led shifts of Plaintiff (B shift) and her female peer (A shift) at Troop 4, (*id.* at ¶ 68);

11. Lieutenant John McColgan's written harassment and belittling of Plaintiff nearly daily at Troop 4, beginning in November 2016, (*id.* at ¶¶ 122-23);

12. McColgan's physical assault of Plaintiff's breasts on or about November 14, 2017, (*id.* at ¶¶ 132-34);

13. Layfield's false accusations of misconduct of her on November 15, 2017, (*id.* at ¶¶ 138-40);

14. McColgan having Lieutenant Mentino DiSilvestro unfairly writeup Plaintiff on November 22, 2017, (*id.* at ¶ 150); and

15. Layfield's transfer of virtually Plaintiff's entire shift away from her in late 2017, (*id.* at ¶ 154).

**B.  Non-Discrete Acts of Discrimination Less Than 300 Days Before the Charge (2018).**

1. Layfield's texting Plaintiff's doctor's note intended for a person not authorized to receive it, falsely accusing Plaintiff of using a "diet doctor," illegally disclosing to a Troop 5 Lieutenant not under his command, with no right to know Plaintiff's private medical information, that she was "nuts" and out for mental issues, and using police code for a possible mentally handicapped subject, (*id.* at ¶¶ 165-71);

2. Allowance of male troopers to spread false rumors on or after February 9, 2018, that she was not at work because she had lost her mind, (*id.* at ¶ 174);

3. Defendant's deletion of all of Plaintiff's e-mails and termination of her e-mail access between February 9th and December 31st, 2018, (*id.* at ¶ 177); and

4. Defendant's prohibition of Plaintiff from soliciting or receiving additional leave time from co-workers between February 9th and December 31st, 2018, (*id.* at ¶ 180).

## II.  Plaintiff's Protected Activity Before Her EEOC Charge Filing.

**A.  Troop 7 (July 2002-May 2007).**  Plaintiff reported the acts of vandalism to her vehicle, mailbox, and uniform hat to Sergeant Ken Hardy and other supervisors.  *Id.* at ¶ 44.

**B.  Fatal Unit (May 2007-July 2011) and Troop 7's D Shift (July 2011-January 2013).**  From 2002 to July 2011, Plaintiff reported at least three (3) incidents of harassment by Steve Smyk and others to her supervisors, including Sergeants Hardy and Barry Dean.  *Id.* at

¶ 37.   Throughout her career at Troop 7, Plaintiff reported harassment because of sex by Smyk and other males to Lieutenant Ron Hagan and Captain John Yeomans.  *Id.* at ¶ 38.

**C.  EPU (January 2013-November 2016).**  Plaintiff reported to Colonel McQueen and other superiors for years the sex-based harassment in the EPU.  *Id.* at ¶ 118.  She reported several incidents of sexual harassment by male Corporal Jim Rossi to McQueen, and to then First Lady Markell.  *Id.* at ¶¶ 91, 103.  When Major John Evans confronted her about a rumor he knew was false that she was having an affair with Trooper Kevin Becker, she said Defendant is making a hostile work environment for her as no one had protected her from the rumors.  *Id.* at ¶ 88-89.

**D.  Troop 4's B Shift (November 2016-March 4, 2018).**  Around November 2016, Plaintiff reported to Captain Layfield and confronted Sergeant Mitchell about his false rumors that she slept with her subordinates in the EPU and now worked on the road to have sex with more males.  *Id.* at ¶¶ 85-86.  She also e-mailed reports to Layfield about Lieutenant McColgan's derogatory, belittling e-mails.  *Id.* at ¶ 124.  She also informed McColgan and Layfield of the understaffing of just eight (8) members each in the female led A and B shifts and ten (10) members each in the male led C and D shifts and asked for each shift to have an equal number of members.  *Id.* at ¶¶ 68, 71.  On November 15, 2017, she told Layfield she wanted McColgan brought up on a charge for pushing her in the breasts.  *Id.* at ¶ 139.

**III.   Discrete and Non-discrete Acts of Discrimination Before and After the Charge.**

**A.      Involuntary Transfer to Troop 5 (January 29, 2018).**  Layfield told detectives he was not going to stop until he got Plaintiff out of Troop 4.  *Id.* at ¶ 152.  Defendant's custom was not to transfer a senior officer absent a request.  *Id.* at ¶ 153.  Plaintiff was the most senior Patrol Sergeant in Sussex County.  *Id.* at ¶ 160.  Yet, on January 29, 2018, Layfield violated

4

policy by calling her on vacation and prematurely telling her she was being transferred effective March 4, 2018, to Troop 5. *Id.* at ¶ 155. DSP has not involuntarily transferred another Sergeant from patrol without discipline. *Id.* at ¶ 159. Rather than select another woman or anyone with a history of discrimination complaints, DSP replaced Plaintiff with a male, brand-new Sergeant. *Id.* at ¶ 161.

> **B.     Involuntary Termination of Employment.**

> > **1.    Forced Medical Leave (February 2018).**  McQueen and Layfield transferred Plaintiff to Troop 5, to further harass her, and they caused her mental and emotional harm. *Id.* at ¶ 158. On February 7, 2018, her doctor ordered her on medical leave indefinitely for Stress and Depression. *Id.* at ¶ 162. Defendant forced Plaintiff out on medical leave on February 9, 2018. *Id.* at ¶ 176.

> > **2.    Non-Discrete Acts of Harassment Less Than 300 Days Before the Charge.**

> > > **a.   Disclosure of Private Facts and More Rumors.**  *See supra* Parts I.B.1-2.

> > > **b.   Termination of E-mail and Prohibition of Soliciting Leave Time.**

**(February 9th - December 31st, 2018).**  Defendant does not terminate Troopers' e-mail access until after they retire but terminated Plaintiff's access and deleted all of her e-mails between February 9th and December 31st, 2018. *Id.* at ¶¶ 177-78. Also, its Standard Operating Procedures allow Troopers needing additional leave time to solicit and receive it from their co-workers, but it prohibited Plaintiff from soliciting or receiving such time between February 9th and December 31st, 2018. *Id.* at ¶¶ 179-180. Defendant allowed most, retiring male officers to use their accrued, paid leave for approximately one year or more before their eventual retirement date, but McQueen told Plaintiff he was separating her before her leave was exhausted. *Id.* at ¶ 186.

**3.   EEOC Charge Filing and Notice of Separation from Employment.**  On October 27, 2018, "Plaintiff filed [an] administrative complaint with the [EEOC]." *Id.* at ¶ 5. Then, on October 31, 2018, McQueen informed her in writing that Defendant was separating her from employment effective December 31, 2018.  *Id.* at ¶ 181.  Exactly two months later, "[o]n December 31, 2018 . . . McQueen separated Plaintiff from employment." *Id.* at ¶ 183.

## ISSUE(S) PRESENTED

Did Plaintiff exhaust her administrative remedies and state plausible claims for hostile work environment, sex discrimination, and retaliation that survive the statute of limitations?

## DISCUSSION

### I.  For Count I, the Continuing Violations Doctrine Allows Plaintiff to Plead and the Court to Consider Alleged Behavior Over 300 Days Before the EEOC Charge Filing.[1]

"[Title VII] precludes recovery for discrete acts[2] of discrimination or retaliation that occur outside the statutory time period[.]" *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 105 (2002).[3]  However, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible [to] assess[] liability, . . . so long as an act contributing to that hostile environment takes place within the statutory time period." *Id.*[4]  In *Morgan*, the plaintiff alleged 1) discrete discriminatory and retaliatory acts and

---

[1] Unless noted otherwise, Plaintiff's Discussion Parts I, II, III, and IV address Defendant's Argument Parts A, B, C, and D respectively.

[2] Discrete acts include termination and denial of transfer.  *See id.* at 114.

[3] "In a State [like Delaware] that has an entity with the authority to grant or seek relief with respect to the alleged unlawful practice, an employee . . . must file the [EEOC] charge . . . within 300 days of the employment practice[.]" *Morgan*, 536 U.S. at 109.

[4] Hostile environment claims are "different in kind from discrete acts.  [They] involve[] repeated conduct." *Id.* at 115 (internal citation omitted).  "The 'unlawful employment practice' . . . occurs over a series of days or *perhaps years* and . . . a single act of harassment may not be actionable on its own." *Id.* (emphasis added) (citing *Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 21 (1993)).

2) a hostile work environment throughout his employment.  536 U.S. at 104 (2002) (race).  Thus, he asserted Title VII claims of discrimination, hostile environment, and retaliation.  *Id.* at 107-08.  Regarding hostile environment, he alleged that during his employment, he was "consistently harassed and disciplined more harshly than other employees [because] of his [protected class]." *Id.* at 105.  Many of the allegedly discriminatory acts took place more than 300 days before the EEOC charge filing.  *Id.* at 106.  The Supreme Court "consider[ed] whether, and under what circumstances, a Title VII plaintiff may file suit on events that fall outside th[e] statutory time period." *Id.* at 105.  The Court held that a "charge alleging a hostile work environment claim, . . . will not be time barred so long as all acts which constitute the claim are part of the same unlawful employment practice and at least one act falls within the time period." *Id.* at 122.

Like *Morgan*, Plaintiff here alleges she was subjected to 1) discrete acts (involuntary transfer and termination) and 2) a hostile work environment throughout her employment from 2002 to 2018.  Thus, she too alleged hostile work environment (Count I), discrimination (Counts II and III), and retaliation (Counts IV and V) claims.  Regarding hostile environment, she similarly alleged that during her employment, Defendant "engaged in a continuing pattern of harassment of [her] because of her sex from 2002, through December 31, 2018." FAC at ¶ 32. Some of the allegedly discriminatory acts occurred less than 300 days before her charge filing on October 27, 2018.  *See* Statement of Facts *supra* Parts I.B.1-2, III.  However, many of the discriminatory acts took place over 300 days before the Charge.  *See id.* at Parts I.A.1-15.

However, in assessing liability, the Court is permitted to consider the entire scope of Plaintiff's hostile work environment claim, including behavior alleged outside the statutory time period, (*id.* at Parts I.A.1-15), because at least one act contributing to that hostile environment

7

took place within the statutory time period.  *Id.* at Parts I.B.1-2.  Here, "[t]he 'unlawful employment practice' [did not] occur on [a] particular day[; i]t occur[ed] over a series of . . . years and, . . . a single act of harassment [like one act of vandalism, one false rumor, one unfair writeup, or one touching of one's breasts] m[ight] not [have] be[en] actionable on its own." *Morgan*, 536 U.S. at 115 (citing *Harris*, 510 U.S. at 21).  However, Plaintiff's hostile work environment "claim [is] based on the cumulative effect of [all of the enumerated] acts." *Id.* Here, all of the acts which constitute the hostile environment claim, (*see* Statement of Facts *supra* Parts I.A.1-15, B.1-2), are part of the same unlawful practice of sex discrimination by the Delaware State Police.  Further, at least one act falls within the 300 day time period.  *See id.* at Parts I.B.1-2.  Therefore, Plaintiff's hostile work environment claim is not barred by the statute of limitations.

## II.  For Counts I, III, and V, Plaintiff Exhausted Her Administrative Remedies Because the Allegations of Hostile Work Environment, Discriminatory Termination and Retaliatory Termination Are Fairly Within the Scope of the Charge or the Investigation Arising Therefrom.

The test to determine if an employee was required to exhaust her administrative remedies is "whether the acts alleged in the subsequent Title VII suit are fairly within the scope of the prior EEOC complaint, or the investigation arising therefrom." *Waiters v. Parsons*, 729 F.2d 233, 237 (3d Cir. 1984).  The scope of an EEOC complaint is what could "reasonably [have been] expected to grow out of the charge." *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 399 (3d Cir. 1976).  That scope "should be liberally construed." *Hicks v. ABT Assocs., Inc.*, 572 F. 960, 965 (3d Cir. 1978).  To determine if a claim fairly or reasonably falls within the investigation arising from a charge, courts consider whether the 1) claim arises from the same set

8

of facts that support the original charge and 2) advances the same theory of discrimination as the original charge. *Simko v. United States Steel Corp.*, 992 F.3d 198, 209 (3d Cir. 2021).

A. **The Hostile Work Environment Claim Advances the Same Discrimination Theory and Arises from the Same Set of Facts That Support the Charge.**

The hostile work environment claim advances the same theory of discrimination as the Charge: harassment because of sex. The Charge referenced "*a continuing pattern of harassment of* [Plaintiff] *because of* [her] *sex since 2002*," "[c]ontinuing, [s]ex-[b]ased [h]arassment[,]" "unlawful, sex-based harassment in the workplace[,]" and "sex-based harassment for years[.]" Charge at 1, §§ A, B, and at 2, § C.1 (emphasis added). Thus, it used more precise words: 1) "sex-based harassment" rather than "hostile" or "abusive," 2) "workplace" not "work environment," and 3) "continuing pattern" and "for years" rather than "atmosphere." The words in the Charge are analogous to "hostile work environment" and "abusive atmosphere."

In *Navarro v. Wal-Mart Assocs., Inc.*, the charge identified race discrimination relating to a failure to promote but contained no facts that suggested a hostile work environment. 2020 WL 777202 (D. Del. Feb. 18, 2020), at *5 (internal citation omitted). Thus, this District Court dismissed the hostile work environment claim as "not fairly within the scope of the EEOC charge." *Id.* In *Barzanty v. Verizon PA, Inc.*, the charge identified only an allegation of gender discrimination relating to a discharge and provided no facts that suggested a hostile work environment. 361 F.App'x 411, 414 (3d Cir. 2010). Also, the employee did not check the box on her charge for a "continuing action." *Id.* Thus, our Circuit held that the hostile work environment claim was "outside the scope of [the] charge[.]" *Id.* at 415. In contrast, here, Plaintiff checked the box for continuing action and alleged fourteen incidents of sex-based harassment. *Cf.* Statement of Facts *supra* Parts I.A.1-6, 8-10, 12-15, B.1-2, and Charge at §§ B,

9

C.1-3, 5.  Thus, the hostile work environment claim arises from the same set of facts supporting

the Charge.

### 1.  Harassment Incidents Not Fully Specified in the Charge Were Exhausted.

An "administrative charge of discrimination does not strictly limit a [discrimination] suit which

may follow." *Sydnor v. Fairfax Cnty.*, 681 F.3d 591, 594 (4th Cir. 2012) (citations omitted).  A

plaintiff need not allege in an EEOC charge each and every fact that combines to form the basis

of each claim in her complaint.  *Delgado v. Merit Sys. Prot. Bd.*, 880 F.3d 913, 926 (7th Cir.

2018) (quotation omitted).  An employee may seek "judicial relief for incidents not listed in h[er]

[EEOC] charge" if they are "like or reasonably related to the allegations of the . . . charge."

*Martinez v. Potter*, 347 F.3d 1208, 1210 (10th Cir. 2003).

> In determining whether a plaintiff has exhausted allegations that she did
> not specify in her administrative charge, it is appropriate to consider such
> factors as the alleged basis of the discrimination, dates of discriminatory
> acts specified within the charge, perpetrators of discrimination named in
> the charge, and any locations at which discrimination is alleged to have
> occurred.  In addition, the court should consider plaintiff's civil claims to
> be reasonably related to allegations in the charge to the extent that those
> claims are consistent with the plaintiff's original theory of the case.

*B.K.B. v. Maui Police Dep't*, 276 F.3d 1091 (9th Cir. 2002).[5]  Defendant argues that our Charge

omitted the claims that 1) in the Fatal Unit, Sergeant Dean assigned Plaintiff crash investigations

of deceased persons she knew, 2) Corporal Rossi harassed her when they were in the EPU, and

---

[5] *But see Sloan v. City of Pittsburgh*, 110 F. App'x 207, 210 (3d Cir. 2004) ("[P]rior incidents [of
workplace harassment because of race and sex] d[id] not form part of a continuing violation
because they involve[d] different actors *and are of a different nature* than the prior alleged
harassment of [employee's] sons.") (emphasis added) (relying on *Rush v. Scott Specialty Gases,
Inc.*, 113 F.3d 476, 481 (3d Cir.1997) ("[S]exual harassment and failure to promote and train
claims address different types of conduct [because the latter] focuses on the failure to promote
[and the] sexual harassment claim focuses on the use of foul language, demeaning comments,
and inappropriate touching by [the employee's] co-workers and some managers.")

3) Lieutenant McColgan nearly daily harassed her in writing at Troop 4.  All of these incidents have the same alleged basis of discrimination alleged in the charge (sex), and occurred during the dates of discriminatory acts specified therein ("continuing pattern of [sex-based] harassment . . . since 2002," with the then latest discrimination on February 9, 2018), (*see* Charge at 1, § A), at the same locations at which discrimination was alleged to have occurred: the Fatal Unit, (*see id.* at 2, § B), the EPU, (*id.* at § C.1), and Troop 4.  *Id.*  For Dean's assignments, the Charge even states "In the Fatal Unit, [Plaintiff] was required to deliver . . . more unpleasant notifications than [her] male peers." *Id.* at 2, § B.  For Rossi's harassment, she alleged, "I reported the sex-based harassment for years . . . in the EPU[.]" *Id.* at 2 § C.1.  McColgan is listed in the Charge as a perpetrator of discrimination including physical, visual, and other, written harassment.  *Id.* at 2 §§ C.2, 3.  Thus, 1) these claims advance the same theory of the case: a continuing pattern of sex-based harassment in the Delaware State Police since 2002, and 2) liberally construed, these acts a) arise from the same set of facts that support the Charge or b) are within the scope of what reasonably could have been expected to grow out of the Charge.  So, Plaintiff exhausted the incidents not fully specified in her Charge.  Thus, for Count I, she exhausted her administrative remedies.[6]

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

---

[6] "A discriminatory act which is not made the basis for a timely charge . . . may constitute relevant background evidence in a proceeding in which the status of a current practice is at issue[.]" *United Air Lines, Inc. v. Evans*, 431 U.S. 553, 558 (1977).  Thus, even if the Court holds that any of the aforementioned incidents involving Dean, Rossi, or McColgan were discrete acts separate from the hostile work environment that was the basis for Plaintiff's Charge, they are still relevant background evidence in this suit in which the status of the "current practice [of a hostile work environment because of sex] is at issue[.]"

**B.     The Termination Claims Advance the Same Discrimination Theories as the Charge and Arise from the Same Set of Facts That Support the Charge.**

Here, each termination claim advances the same theory of discrimination as the Charge: sex (Count III) and retaliation (Count V).  Liberally construed, those claims arise from the same facts that support the Charge.  *Cf.* Charge of Discrimination at 2, § C.2 ("On February 7, 2018, my doctor ordered me on medical leave indefinitely for Stress and Depression[,]") and FAC at ¶ 162 ("On February 7, 2018, Plaintiff's doctor ordered [her] on medical leave for Stress and Depression[,]") and ¶¶ 212, 226 ("[She] was forced to go out on medical leave.")  "*Waiters*[ *v. Parsons*, 729 F.2d 233 (3d Cir. 1984),] involved an investigation of retaliatory conduct that went beyond the four corners of the EEOC charge."  *Simko*, 992 F.3d at 209.  There, *Waiters* filed an EEOC charge of sex discrimination and over a year later another charge alleging retaliation for her earlier complaint.  *Id.* (citing *Waiters*, 729 F.2d at 235).  After filing the sex discrimination and retaliation charges, she was discharged but did not file a new charge for her termination.  *See id.* at 236.  She then brought a Title VII suit alleging retaliatory discharge.  *Id.*  Although the post-charge episodes of misconduct involved different officials and occurred over thirty months later, our Circuit held "the core grievance - retaliation - is the same and, at all events, it is clear that the allegations of the [employee]'s complaint fall within the scope of the [EEOC's] investigation of the charges contained in the [EEOC retaliation] complaint."  *Id.* at 238.  Thus, plaintiff did not need to file a separate charge for her retaliatory discharge claim.  *Id.*

Here, Plaintiff filed an EEOC charge of sex discrimination and retaliation prior to her discharge.  Like *Waiters*, our Plaintiff was discharged after she filed the retaliation charge and did not file a new charge for her termination.  She too then brought a Title VII suit alleging retaliatory discharge.  Here, the post-charge retaliatory or discriminatory conduct was not by

12

different officials nor occurred over thirty months later.  Rather, it was by one of the same officials and began just four days after her charge was filed on October 27, 2018.  Specifically, McQueen, informed Plaintiff in writing on October 31, 2018, that Defendant was separating her from employment effective December 31, 2018.  FAC at ¶ 181.  He then did separate her exactly two months later on December 31st.  *See id.* at ¶ 183.  Further, he was one of the same officials who had denied her the housing benefit given to males in the EPU, (*id.* at ¶ 77), and transferred her to the jurisdiction where her brother was found dead.  *Id.* at ¶ 158.  These episodes of misconduct were set forth in the Charge.  *See* Charge at § B (denial of housing benefit) and § C.4 (transfer).  Thus, like in *Waiters*, the core grievances - retaliation and sex discrimination - are the same and, at all events, it is clear that the allegations of the FAC fall within the scope of the EEOC's investigation of the charges contained in the EEOC complaint.  Thus, Plaintiff did not need to file a separate EEOC Charge for her discharge claims.  Therefore, she exhausted her administrative remedies for Counts III and V.

III. **Plaintiff Exhausted Her Administrative Remedies for Her Retaliatory Transfer Claim (Count IV), and Stated Plausible Claims for Retaliatory Transfer and Retaliatory Termination (Count V).**

To establish a prima facie case of retaliation under Title VII, the employee must show 1) she engaged in protected activity, 2) adverse action, and 3) a causal link exists between the activity and the action.  *Kachmar v. SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997).

[*REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.*]

13

A.    **For Count IV, the Retaliatory Transfer Claim is Contained in the Charge.**[7]

Here, Plaintiff's Charge alleged 1) protected activity: "[Plaintiff] informed Lt. John McColgan, Captain Rodney Layfield, and others [of] the imbalance [of members between A and B shifts and C and D shifts at Troop 4,] favoring [her] male peers and their shifts." Charge at 2, § B.[8]  Then, Plaintiff alleged adverse action: "[O]n January 29, 2018, [Captain Layfield] violated policy by calling [her] on vacation and prematurely t[elling her] he was transferring [her] effective March 4, 2018, to Troop 5[.]" *Id.* at § C.4.  Then, Plaintiff alleged a causal link: "Troop 5 [was] the Troop farthest from [her] home and in the same jurisdiction where [her] brother was found dead on the roadside on July 4, 2016.  DSP has not involuntarily transferred any other Sgt. from patrol without discipline[e].  Though [Plaintiff] was the most senior Patrol Sgt. in Sussex County, DSP involuntarily transferred [her.]" *Id.*  Rather than select another employee with a history of discrimination complaints, "DSP . . . replaced [Plaintiff] at Troop 4, with a brand new Sgt." *Id.*  Then, the FAC contains these same allegations of 1) protected activity, (*see* Statement of Facts *supra* Part II.D), adverse action, (*see id.* at Part III.A), and 3) a causal link.  *Id.*  There are no surprises here.  For Count IV, the retaliatory transfer claim was contained in the Charge.

B.    **For Count IV, Plaintiff Stated a Plausible Claim for Retaliatory Transfer.**[9]

1.    **Protected Activity.**  *See* Statement of Facts *supra* Part II.D.

2.    **Adverse Action.**  In arguing that Plaintiff cannot establish adverse action because the Complaint fails to allege how the transfer to Troop 5, altered her compensation,

---

[7] Discussion Part III.A addresses Defendant's Argument § B at 10, ¶ 2.

[8] Also, she "informed [her] leadership of several, similar rumors that [she] was sleeping with male co-workers . . . ." *Id.*  "[She] reported the sex-based harassment for years[.]" *Id.* at § C.1.

[9] Discussion Parts III.B and C address Defendant's Argument Part C.

privileges, status, or opportunities, Defendant confuses Title VII's substantive provision against discrimination with its provision against retaliation. The Supreme Court has explained that Title VII's antiretaliation provision protects an individual from "retaliation that produces an injury or harm." *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67 (2006). "[A] plaintiff must show that a reasonable employee would have found the challenged action materially adverse, . . . mean[ing] it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination[,]" *Id.* at 68 (internal citations omitted). The provision "prohibit[s] employer actions that are likely 'to deter victims of discrimination from complaining to the EEOC,' the courts, and their employers." *Id.* "Whether [the] reassignment is materially adverse . . . 'should be judged from the perspective of a reasonable person in the plaintiff's position, considering 'all the circumstances.'" *White*, 548 U.S. at 71 (quoting *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 81 (1998)). In *White*, the Court noted that "'[r]etaliatory work assignments' [are] a classic and 'widely recognized' example of 'forbidden retaliation.'" *Id.* at 71 (internal citation omitted). Thus, it reasoned that because almost every job category involves some responsibilities and duties that are less desirable than others, "[c]ommon sense suggests that one good way to discourage an employee . . . from bringing discrimination charges would be to insist that she spend more time performing the more arduous duties and less time performing those that are easier or *more agreeable*." *Id.* at 70-71 (emphasis added).

Here, the alleged retaliation (involuntary transfer to where Plaintiff's brother recently was found dead on the roadside) produced an injury or harm: Her doctor ordered her on medical leave with Stress and Depression just nine (9) days after notice of the transfer. Such a transfer well might have dissuaded a reasonable worker from making a charge if she knew this would be

15

the employer's subsequent action.  A transfer from Troop 4 to Troop 5, might be immaterial to an officer living equidistant to both troops who has not recently lost an immediate relative in the new jurisdiction.  Responsibility for patrolling the jurisdiction where one's brother recently died was a responsibility less desirable than similar patrol duties in Troop 4.  Common sense suggests that one good way to discourage Plaintiff from bringing discrimination charges would be to insist she spend more time performing the more arduous or more difficult duty of patrolling Troop 5, and less time (or no more time) performing the easier or more agreeable duty of patrolling Troop 4.  This retaliatory work assignment was a classic example of forbidden retaliation.  Judged from the perspective of a reasonable person in the Plaintiff's position and considering all the circumstances, the involuntary transfer to Troop 5, was materially adverse.  Thus, Plaintiff alleged an adverse action in her retaliatory transfer claim in Count IV.[10]

       **3.**      **Causal Connection.**   Finally, Plaintiff alleged causal connections between the protected activity and the adverse transfer.  Causation can be proven three ways: 1) "temporal proximity between the employee's protected activity and the adverse employment action[,]" 2) "circumstantial evidence of a pattern of antagonism following the protected conduct[,]" or 3) "the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar*, 109 F.3d at 177 (internal quotation marks and citations omitted).

       **a.**      **Pattern of Antagonism.**  There is a pattern of antagonism following the protected conduct.  On November 14, 2017, Lieutenant McColgan yelled at Plaintiff, put both hands on her breasts, and forcefully pushed her out of his office.  *Id.* at ¶¶ 132,

---

[10] Alternatively, as a matter of law, the decision to transfer her to a less desirable assignment is an adverse action that occurred when she received notice of it.  *See infra* Parts IV.A, IV.A.1.

134.  He immediately began speaking about her in a derogatory manner and rejecting her police reports for alleged deficiencies for which he never previously rejected them.  *Id.* at ¶ 137.  Then, on November 15, 2017, Captain Layfield falsely accused Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to McColgan.  *Id.* at ¶ 138.  When Plaintiff told Layfield that she in turn wanted McColgan brought up on the latter charge for pushing her in the breasts, Layfield became very angry, yelled at Plaintiff, and told her she was not going to bring charges against McColgan.  *Id.* at ¶¶ 139-140.  Immediately after that, Layfield and McColgan mentally tortured Plaintiff for two days by making her sit in a conference room and trying to make her think that she was the problem rather than a victim of sexual harassment.  *Id.* at ¶¶ 141, 146.  On November 22, 2017, McColgan had Lieutenant DiSilvestro unfairly write up Plaintiff for Failure to Arrest When an Arrest Was Warranted despite the fact that the domestic abuse victim did not want to press charges.  *Id.* at ¶ 150. Layfield told detectives that he was not going to stop until he got Plaintiff out of Troop 4.  *Id.* at ¶ 152.  Then on January 29, 2018, he gave her notice of her transfer.  *Id.* at ¶ 155.

       **b.  Evidence as a Whole.**  Alternatively, the proffered evidence, looked at as a whole, suffices to raise the inference of causation.  Layfield violated policy by calling Plaintiff on vacation and prematurely telling her of her transfer in 34 days.  *See id.* at ¶ 155.  It was to the Troop farthest from her home and in the jurisdiction where her brother recently was found dead.  *Id.* at ¶¶ 156-57.  It was DSP's custom not to transfer senior officers unless they requested it, (*id.* at ¶ 153), and Plaintiff was the most senior Patrol Sergeant in Sussex County. *Id.* at ¶ 160.  Further, DSP has not involuntarily transferred any other Sergeant from patrol without discipline.  *Id.* at ¶ 159.  Rather than assign another officer with any history of making

17

discrimination complaints, Defendant replaced Plaintiff at Troop 4, with a brand new Sergeant. *Id.* at ¶ 161. In sum, the pattern of antagonism following protected conduct or the evidence as a whole raises the inference of a causal connection between the protected activity and the adverse action. Thus, for Count IV, Plaintiff plausibly stated her claim for retaliatory transfer.

      **C.**    **For Count V, Plaintiff Stated a Plausible Claim for Retaliatory Termination.**

      **1.**    **Protected Activity.** *See* Statement of Facts *supra* Part II.D. Also, on October 27, 2018, "Plaintiff filed [an] administrative complaint with the [EEOC]." FAC at ¶ 5.

      **2.**    **Adverse Action.** Defendant does not deny termination is adverse action.

      **3.**    **Causal Connection.**

      **a. Temporal Proximity.** Here, on October 27, 2018, "Plaintiff filed [an] administrative complaint with the [EEOC]." *Id.* at ¶ 5. Then on October 31, 2018, McQueen informed Plaintiff in writing of her separation. *Id.* at ¶ 181. This was just four days after her Charge was filed.

      **b. Pattern of Antagonism.** *See supra* Part III.B.3.a. *See also* Statement of Facts *supra* Parts I.B.1-2. Again, on October 31, 2018, McQueen informed Plaintiff that Defendant was separating her from employment effective December 31, 2018. FAC at ¶ 181.

      **c. Evidence as a Whole.** *See* Statement of Facts *supra* Parts I.B.3-4. In sum, Plaintiff can establish causation for her retaliatory termination claim in three different ways. Thus, for Count V, Plaintiff plausibly stated her claim for retaliatory termination.

**IV.  For Count II, Plaintiff Stated a Plausible Claim for Sex Discriminatory Transfer.**

      For a Title VII claim of sex discrimination, a plaintiff must show that she is a member of a protected class, 2) was qualified for her position, 3) suffered an adverse employment action,

and 4) the action occurred under circumstances that could give rise to an inference of intentional

discrimination. *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 169 (3d Cir. 2013) (citation

omitted).  Defendant does not dispute that the first two elements exist here.

      **A.**    **Adverse Actions Include Transfers.**   For discrimination claims, our Circuit and

other federal courts have found undesired or undesirable transfers to be adverse actions.[11]

"[E]mployment decisions such as transfers . . . may suffice to establish the [adverse action]

element of [the] prima facie case." *Jones v. Sch. Dist. of Philadelphia*, 198 F.3d 403, 411-12 (3d

Cir. 1999) (Title VII) (teacher assigned to teach science classes he regarded as less desirable).

Like *Jones*, Plaintiff regarded her assignment to Troop 5, less desirable as it was the jurisdiction

where her brother recently was found dead on the roadside and farthest from her home.

      **1.**    **Adverse Action Occurred When Plaintiff Was Notified of the**

**Transfer.**  The Supreme Court has recognized that discrimination "occur[s] at the time the

[adverse] decision was made and communicated to [the employee.]" *Delaware State Coll. v.*

*Ricks*, 449 U.S. 250, 258 (1980) (quoting *Abramson v. Univ. of Hawaii*, 594 F.2d 202, 209

(1979) ("proper focus is upon the time of the discriminatory acts, not [when] the consequences of

the acts became most painful.") This District Court also has recognized that notice of an

employment decision is an adverse action.  *See Bullock v. Brandywine Sch. Dist.*, 837 F. Supp.

---

[11] *See, e.g.*, *Torre v. Casio, Inc.*, 42 F.3d at 825, 831 n. 7 (3d Cir. 1994) (age discrimination) (recognizing that a job transfer may constitute an adverse job action); *Rodriguez v. Board of Educ.*, 620 F.2d 362, 364–66 (2d Cir. 1980) (teacher's Title VII sex discrimination claim) (holding adverse job action established where "severe professional . . . trauma" resulted from *difference in* "*the site of [employee's] work* and the age of her pupils") (emphasis added); *Trout v. Hidalgo*, 517 F.Supp. 873, 890 n. 67 (D.D.C. 1981) (Title VII sex discrimination) ("Among other discriminatory actions taken against [employee was] . . . the removal of her office to an *undesirable location* . . . ."), *aff'd in part and rev'd in part sub nom. Trout v. Lehman*, 702 F.2d 1094 (D.C. Cir. 1983), *vacated on other grounds*, 465 U.S. 1056 (1984) (emphasis added)).

2d 353, 363 (D. Del. 2011) (Title VII retaliation) ("Issuance of a non-renewal *notice* . . . unquestionably qualif[ies] as [an] adverse action[].") (emphasis added).[12]  Thus, Plaintiff pleaded an adverse action in her discriminatory transfer claim.

      **B.**    **The Circumstances of the Transfer Give Rise to an Inference of Sex Discrimination.**  *See* Statement of Facts *supra* Parts III.A, B.1, sentence 1.  In sum, these circumstances give rise to an inference of sex discrimination.  Thus, Plaintiff stated a plausible claim for discriminatory transfer in Count II.

<u>**CONCLUSION**</u>

      For all of the foregoing reasons, Defendant's Motion should be denied in its entirety.

    **LaROSA & ASSOCIATES LLC**

    */s/ John M. LaRosa*
    **JOHN M. LaROSA, ESQ.**
    Delaware Bar No. 4275
    1225 King Street, Suite 802
    Wilmington, DE 19801-3246
    (302) 888-1290 (telephone)
    JLR@LaRosaLaw.com

    *Attorney for Plaintiff Nicole L. Hantz*

Dated: September 13, 2021

---

[12] At least one federal court has rejected our Defendant's argument that no adverse action occurred because Plaintiff never actually was transferred.  *See Leglu v. Cty. of Santa Clara*, 2014 WL 4100599, at *9 (N.D. Cal. Aug. 20, 2014) (Title VII harassment, discrimination, and retaliation) ("Defendant produces no evidence that Plaintiff would not have been transferred . . . had he returned to work, and this Court declines to hold that a specific notice of transfer . . . is not an adverse action merely because the Plaintiff left his job prior to the [effective] date[.]")