IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

NICOLE L. HANTZ,                     )
f/k/a NICOLE L. OLDHAM,              )      C.A. No. 21-801-RGA
                                     )
        Plaintiff,                   )
                                     )
    v.                               )      **PUBLIC**
                                     )
DIVISION OF STATE POLICE,            )
DEPARTMENT OF SAFETY &               )
HOMELAND SECURITY,                   )
STATE OF DELAWARE,                   )
                                     )
        Defendant.                   )

**PLAINTIFF'S APPENDIX VOLUME 1: PUBLIC DOCUMENTS
SUPPORTING HER ANSWERING BRIEF IN OPPOSITION TO
<u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>**


**JOHN M. LaROSA, ESQ.**
**LaROSA & ASSOCIATES LLC**
Delaware Bar No. 4275
1225 King Street, Suite 802
Wilmington, DE 19801-3246
(302) 888-1290 (telephone)
(302) 655-9329 (fax)
JLR@LaRosaLaw.com

Dated: November 15, 2023                    *Attorney for Plaintiff Nicole L. Hantz*

## TABLE OF CONTENTS

A.    LETTER of Representation of Charging Party from J. LaRosa to
      J. Gmitter, U.S. Equal Employment Opportunity Commission (Oct. 27, 2018). . . . . .  B1

B.    CHARGE OF DISCRIMINATION of Nicole L. Oldham (Oct. 23, 2018) . . . . . . . . .  B2

C.    FIRST AMENDED COMPLAINT (Jul. 14, 2021)  . . . . . . . . . . . . . . . . . . . . . . . . . . B4

D.    DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT (Jun. 24, 2022) . B35

E.    Delaware State Police Troop LOCATIONS,
      https://dsp.delaware.gov/locations/ (last visited Nov. 14, 2023) . . . . . . . . . . . . . . B54

**LaRosa & Associates**
1225 King Street, Suite 802
Wilmington, Delaware 19801-3246

PHONE: (302) 888-1290
FAX:    (302) 655-9329

LICENSED IN DE, PA, AND NJ
INTERNET: WWW.LaRosaLaw.com

October 27, 2018

Ms. Joan D. Gmitter
Charge Receipt Supervisor
U.S. Equal Employment Opportunity Commission
Philadelphia District Office
801 Market Street, PH
Philadelphia, PA 19107-3127

RE:   Nicole L. Oldham (Charging Party) v.
      State of Delaware, Department of Homeland Security, Division of State Police (Respondent)
      Letter of Representation of Charging Party

Dear Ms. Gmitter:

I am a lawyer acting on behalf of Nicole L. Oldham in her pending case of continuing sex and discrimination and retaliation by her current employer including, but not limited to, its involuntary transfer of her on or about January 29, 2018. I am representing Ms. Oldham for purposes of filing the enclosed charge of discrimination and the agency's investigation.

Enclosed is a two sided signed original and a singled sided copy of her Charge of Discrimination. Please acknowledge receipt of this letter and the Charge of Discrimination by affixing your stamp to the Charge and returning a copy to me.

Very Truly Yours,

John M. LaRosa

Enclosures

Attorney Files/John's Files/Client Files/JLR Clients/Oldham/SEOC/EEOC LOR

**CONFIDENTIAL**

P0467

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974; See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| X EEOC | |

and EEOC

**Delaware Department of Labor, Division of Industrial Affairs, Office of Anti-Discrimination**

State or local Agency, if any

| NAME (indicate Mr., Ms., Mrs.) | Home Phone (Incl. Area Code) | Date of Birth |
|---|---|---|
| Ms. Nicole L. Oldham | (302) 725-7497 | 08/14/1974 |

| Street Address | City, State and ZIP Code |
|---|---|
| 22305 Raven Circle | Lincoln, Delaware 19960 |

Named is the Employer, Labor Organization, Employment Agency, Apprenticeship Committee, or State or Local Government Agency That I Believe Discriminated Against Me or Others. (If more than two are named, list under PARTICULARS below.)

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| State of Delaware, Department of Safety and Homeland Security, Division of State Police | More than 1,000 | (302) 739-5960 |

| Street Address | City, State and ZIP Code |
|---|---|
| 1441 North DuPont Highway | Dover, Delaware 19901 |

| Name | No. Employees, Members | Phone No. (Incl. Area Code) |
|---|---|---|
| | | |

| Street Address | City, State and ZIP Code |
|---|---|
| | |

| DISCRIMINATION BASED ON (Check appropriate box(es).) | DATE(S) DISCRIMINATION TOOK PLACE |
|---|---|
| ☐ RACE   ☐ COLOR   X SEX   ☐ RELIGION   ☐ NATIONAL ORIGIN | Earliest            Latest |
| X RETALIATION   ☐ AGE   ☐ DISABILITY   ☐ GENETIC INFORMATION | 07/01/2002    02/09/2018 |
| ☐ OTHER (Specify) | X CONTINUING ACTION |

THE PARTICULARS ARE (If additional paper is needed, attach extra sheet(s)):

A.  Employment History & Dates of Discrimination. I am a female police Sergeant employed by Respondent Delaware State Police ("DSP") since July 2002. I was the 1st female Academy Class President and from my Class, was the 1st assigned to a special unit and the 1st promoted. I was a 2004 Trooper of the Year nominee and earned the Governor's Excellence, the Firearms Excellence, the Lifesaving Excellence, and the Lifetime DUI/ MADD Awards. In May 2007, I was the 1st female assigned to the Fatal Unit. I was promoted to Sergeant ("Sgt.") in July 2011, and supervised Troop 7's D Shift from then to January 2013. From then to November 2016, I was in the Governor's Executive Protection Unit ("EPU") to protect the Governor, his Lieutenant Governor, and their families. I became the 1st woman named EPU's Officer in Charge based on merit. In Troop 4's B Shift from November 2016 to February 7, 2018, I supervised the 2016-2017 Trooper of the Year who received the award due in part to my tutelage. On my latest evaluation on or about February 13, 2018, my supervisor Lieutenant ("Lt.") Mentino DiSilvestro rated my performance as Consistently Exceeds Expectations, the 2nd highest of 3 ratings. Before November 2017, I received virtually no written discipline. Yet, DSP is engaging in a continuing pattern of harassment of me because of my sex since 2002. [illegible] forcing me on a medical leave on February 9, 2018. I remain on leave to date.

B.  Continuing Sex-Based Harassment. Early in my career, fellow [illegible] Trooper Steve Symk circulated a false e-mail claiming I conducted a stop with my child in the car and was car jacked. He stated this "FEMALE trooper" should not be [illegible] for this incident. He was reporting these lies to help out his "brothers" in the DSP. He received a talking to but no discipline. I was told to drop it though it was unlawful, sex-based harassment in the workplace. I reported at least 3 later incidents of harassment by him, but DSP took no further action against him. Also, many times after my vacations, my vehicle had flat tires, equipment missing, or lubricant on the door handles and steering wheel, and my mailbox was vandalized with derogatory stickers and pictures.

| I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures. | NOTARY – When necessary for State and Local Requirements |
|---|---|
| | I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief. |
| I declare under penalty of perjury that the foregoing is true and correct. | SIGNATURE OF COMPLAINANT |
| | |
| See Page 2. | SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year) |
| Date              Charging Party Signature | |

## CHARGE OF DISCRIMINATION

This form is affected by the Privacy Act of 1974. See enclosed Privacy Act Statement and other information before completing this form.

| Charge Presented To: | Agency(ies) Charge No(s): |
|---|---|
| ☐ FEPA | |
| X EEOC | |

**and EEOC**

Delaware Department of Labor, Division of Industrial Affairs, Office of Anti-Discrimination
*State or local Agency, if any*

THE PARTICULARS ARE *(Continued from previous page)*: I produced arrest numbers higher than some male detectives doing criminal work 24/7, but senior officers told me to slow down because my arrests caused less productive males to fall below the Troop average. In the Fatal Unit, Respondent gave me no victim service training to deliver death notifications but gave it to males in the Victim Services Unit. I was required to deliver more notifications and more unpleasant notifications than my male peers. Though I earned certification as a law enforcement instructor, DSP prevented me from teaching defensive tactics but permitted lower ranking males to do so. At Troop 4, my squad had just 9 members each in B and A shifts while the male led C and D shifts each had 10. This lowered proactive patrol time for and increased overtime requests from my understaffed shift. Though I informed Lt. John McColgan, Captain Rodney Layfield, and others, DSP took no action to correct the imbalance favoring my male peers and their shifts. In the EPU, I requested the same free housing benefit in New Castle County ("NCC") given to my male peers. In response, male Lt. Michael J. Wysock told a male Sgt., "She can suck my dick." When I refused, I was required to pay $500 monthly to live with a NCC homeowner while my male peers were 1) given free use of NCC houses or 2) allowed to live in Sussex County and receive pay (against DSP policy) to commute. When I was selected for the EPU, male troopers placed a photo and a message in my mailbox falsely claiming I performed oral sex on Delaware's Speaker of the House to gain the prestigious EPU job. Recently, a Sgt. started a false rumor that I was reassigned to the road because I had been sleeping with males while on duty. When I previously informed my leadership of several, similar rumors that I was sleeping with male co-workers, I was told to not let it bother me.

**C. Retaliation & More Harassment.** DSP's discrimination and retaliation of me violates Title VII and the Delaware Discrimination in Employment Act.

**1. Transfer to Least Productive Shift & Threat to End Career.** After I reported the sex-based harassment for years and ongoing overtime fraud in the EPU, Respondent did not address either. Unable to stop and unwilling to participate in the fraud, I requested in or around October 2016, a transfer from the EPU. In response, Major Evans told me, "This is a career ender." In November 2016, DSP transferred me to Troop 4's least productive shift: B Shift.

**2. Physical Assault of My Breasts.** On or about November 14, 2017, male Lt. John McColgan unfairly criticized my competence of my shift and me. After I defended my shift, McColgan put both of his hands on both of my breasts and forcefully pushed me out of his office. However, he has not pushed any male Sgts.

**3. Unjustified Discipline.** Later on November 15th, male Captain Rodney Layfield falsely accused me of Insubordination and Conduct Unbecoming an Officer for defending my shift to McColgan. In a meeting with them and DiSilvestro, McColgan leaned back in a chair, grabbed his crotch, obscenely gestured toward me, and told me, "Don't flatter yourself." When McColgan's 2 day long harassment finally drove me to tears, Layfield told me, "I am worried about your mental health." On or about November 22, 2017, McColgan and DiSilvestro unfairly wrote me up for Failure to Arrest when an Arrest Was Warranted though the domestic abuse victim did not want to press charges. Further, none of my male peer Sgts. at Troop 4 even handled domestic abuse incidents, took paper complaint calls, or worked with their shifts from the 911 calls all the way through the arrests like I did.

**4. Transfers & Replacement With Less Experienced Male.** It is DSP's custom not to transfer senior officers unless they request it. Yet, in late 2017, Layfield transferred my entire shift (except my male assistant) from me. Then on January 29, 2018, he violated policy by calling me on vacation and prematurely told me he was transferring me effective March 4, 2018, to Troop 3, the Troop farthest from my home and in the same jurisdiction where my brother was found dead on the roadside on July 4, 2015. DSP has not involuntarily transferred any other Sgt. from patrol without disciplinary action. Though I was the most senior Patrol Sgt. in Sussex County, DSP involuntarily transferred me and replaced me at Troop 4, with a brand new Sgt., a male.

**5. Disclosure of Private Facts & Rumors.** On February 7, 2018, my doctor ordered me on medical leave indefinitely for Stress and Depression. I e-mailed my doctor's note to DSP. On February 9, 2018, Layfield acknowledged by e-mail my medical leave and that HR also was made aware. He attacked me even with false rumors. After hours, at approximately 5:30 p.m., he erroneously texted a copy of my doctor's note intended for a person unauthorized to receive it. In a 2nd text, he derogatorily stated, "Yup, diet doctor." In a 3rd text, he falsely claimed he was notifying Headquarters though he earlier admitted he already had done this. He also illegally disclosed I was out for mental issues to a Troop 3 Lt. who was not in his chain of command and had no right to know my private medical information. Layfield's acts violated DSP's privacy policy and were Conduct Unbecoming an Officer. DSP allowed his male troopers to spread false rumors about me that I am not at work because I have lost my mind. These lies injured my professional reputation.

I want this charge filed with both the EEOC and the State or local Agency, if any. I will advise the agencies if I change my address or phone number and I will cooperate fully with them in the processing of my charge in accordance with their procedures.

NOTARY - When necessary for State and Local Requirements

I swear or affirm that I have read the above charge and that it is true to the best of my knowledge, information and belief.

SIGNATURE OF COMPLAINANT

I declare under penalty of perjury that the foregoing is true and correct.

SUBSCRIBED AND SWORN TO BEFORE ME THIS DATE (month, day, year)

10/23/18
*Date*                    *Charging Party Signature*

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NICOLE L. HANTZ, | ) | |
| f/k/a NICOLE L. OLDHAM, | ) | CIVIL ACTION |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 21-801-RGA |
| | ) | |
| DIVISION OF STATE POLICE, | ) | |
| DEPARTMENT OF SAFETY & | ) | |
| HOMELAND SECURITY, | ) | |
| STATE OF DELAWARE, | ) | |
| | ) | TRIAL BY JURY DEMANDED |
| Defendant. | ) | |

<u>**FIRST AMENDED COMPLAINT**</u>[1]

1.      This is a civil action arising from sex discrimination and retaliation which seeks

compensatory and punitive damages and declaratory and injunctive relief for a female Police

Sergeant of the Delaware State Police who was sexually harassed in a hostile work environment,

physically assaulted, involuntarily transferred to the jurisdiction where her brother had been

found dead on the side of the road less than two years earlier, forced out on medical leave, and

involuntarily separated from employment by Defendant all because of her sex and in retaliation

for her complaints of sex discrimination in violation of Title VII of the Civil Rights Act of 1964,

and the Delaware Discrimination in Employment Act.

---

[1] Plaintiff filed her original Complaint (D.I. 1) on June 1, 2021, and served Defendant it on July 9, 2021.  Pursuant to Rule 15(a)(1)(A) of the Federal Rules of Civil Procedure, she amends her Complaint here as a matter of course within 21 days after serving it.  Prior reference(s) were changed from "Nicole L. Oldham" to "Nicole L. Hantz," from "Steve Symk" to "Stephen T. Smyk," and from "Symk" to "Smyk."  In addition, original paragraphs 43-164 were renumbered.  Also, the caption, the signature block, and current paragraphs 5, 7, 10, 22, 33-39, 41, 44, 52, 55-56, 60, 66, 68, 71, 73, 75-76, 78, 80, 84, 118-19, 132-34, 136, 145, 147, 163, 169, 172, 181, 191, 206, 209-10, 220, and 223-24 were amended.  Finally, new paragraphs 43, 51, 62-65, 70, 72, 74, 77, 79, 88-117, 122-131, 135, 137, 139-144, 152, 158, 185-87, and 199 were added, and the current subheadings were added at §§ III.B.i-ix and III.C.ii, re-numbered at §§ III.C.iii and vi-viii, and amended at §§ III.C.iv-v.

## I. JURISDICTION AND VENUE

2.     The jurisdiction of this Court is invoked pursuant to 28 *U.S.C.* §§ 1331 and 1343; 42 *U.S.C.* § 1981a; and Title VII of the Civil Rights Act of 1964, as amended, 42 *U.S.C.* § 2000e et seq. ("Title VII").

3.     The causes of action arise under Title VII and the Delaware Discrimination in Employment Act ("DDEA").

4.     This Court has supplemental jurisdiction over the state law claims under the DDEA pursuant to 28 *U.S.C.* § 1367.

5.     All conditions precedent to jurisdiction have occurred or have been complied with.  Plaintiff filed a timely administrative complaint with the United States Equal Employment Opportunity Commission ("EEOC").  All administrative proceedings have been terminated.  The EEOC issued Plaintiff by mail a Notice of Right to Sue dated March 2, 2021.  On June 1, 2021, Plaintiff filed her original Complaint within 90 days of receipt of such Notice.

6.     Venue is proper in this district because it is the judicial district where Plaintiff was employed, the unlawful employment practices and the discrimination complained of occurred, and the claims arose.

## II. THE PARTIES

7.     At all times material hereto, Plaintiff Nicole L. Hantz was known as Nicole L. Oldham.  Plaintiff is a female.

8.     From July 2002 until December 31, 2018, Plaintiff was employed by the Defendant Delaware State Police as a police officer, most recently in the rank of Sergeant.

9.     At all times material hereto, Plaintiff was a diligent, honest, and loyal employee

who always performed her job in an exemplary manner.

10.     Defendant Division of State Police, Department of Safety & Homeland Security, State of Delaware ("DSP") is an agency of the State of Delaware.

11.     At all times material hereto, Defendant had over 500 employees.  Defendant is a covered employer under both Title VII and the DDEA.

### III.  FACTS GIVING RISE TO THE ACTION

**A.     Plaintiff's Excellent Employment History (2002-2018).**

12.     Initially in July 2002, Plaintiff was a Recruit Trooper.

13.     Plaintiff was voted her Academy Class President in 2002.

14.     Plaintiff was Defendant's first female Academy Class President.

15.     Then, Plaintiff graduated from the Police Academy and earned a promotion to Trooper in or around July 2001.

16.     Plaintiff subsequently earned a promotion to Trooper First Class in or around July 2003.

17.     Plaintiff subsequently earned a promotion to Corporal in or around July 2006.

18.     From her Academy Class, Plaintiff was the first officer assigned to a special unit.

19.     From her Academy Class, Plaintiff was the first officer promoted.

20.     Plaintiff was a 2004 Trooper of the Year nominee.

21.     Plaintiff earned the Governor's Excellence, the Firearms Excellence, the Lifesaving Excellence, and the Lifetime DUI/MADD Awards.

22.     In May 2007, Plaintiff became the first and the only female ever selected to be a Fatal Investigator in Defendant's Collision Reconstruction Unit ("Fatal Unit").  To earn that

3

assignment, Plaintiff achieved perfect scores on the Institute of Police Technology and Management exams.

23.    In July 2011, Plaintiff earned a promotion to Sergeant.

24.    From July 2011 to January 2013, Plaintiff was the supervisor of Troop 7's D Shift.

25.    In January 2013, Plaintiff was selected for the Governor's Executive Protection Unit ("EPU"). The mission of the EPU is to protect the Governor, his Lieutenant Governor, and their families.

26.    From January 2013 to November 2016, Plaintiff was assigned to the EPU.

27.    Plaintiff became the first woman named EPU's Officer in Charge based on merit.

28.    From November 2016 to February 2018, Plaintiff was the supervisor of Troop 4's B Shift.

29.    In Troop 4's B Shift from November 2016 to February 7, 2018, Plaintiff supervised the 2016-2017 Trooper of the Year.  That trooper received the award due in part to Plaintiff's tutelage.

30.    On her latest evaluation on or about February 15, 2018, Plaintiff's supervisor Lieutenant Mentino DiSilvestro rated her performance as Consistently Exceeds Expectations. This was the second highest of five possible ratings.

31.    From July 2002, through October 2017, Plaintiff received virtually no written discipline.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

**B.      Continuing Pattern of Harassment of Plaintiff Because of Her Sex (2002-2018).**

32.      Throughout Plaintiff's employment, Defendant engaged in a continuing pattern of harassment of Plaintiff because of her sex from 2002, through December 31, 2018.

i.      **E-mail and Other Harassment by Stephen T. Smyk**

33.      Early in Plaintiff's career, then Trooper Stephen T. Smyk, a male, circulated an e-mail falsely claiming that Plaintiff conducted a stop with Plaintiff's child in her car and was car jacked.

34.      Smyk wrote this "FEMALE trooper" should not be on the job and indicated he was reporting these lies to help out his "brothers" in the DSP.

35.      Smyk received a talking to but no discipline.

36.      Though Smyk's conduct constituted unlawful, sex-based harassment in the workplace, Defendant told Plaintiff to drop it.

37.      From 2002 to approximately July 2011, Plaintiff reported at least three (3) subsequent incidents of harassment by Smyk and others to her supervisors.  Upon information and belief, these supervisors included Sergeant Ken Hardy and Sergeant Barry Dean.

38.      While assigned as Plaintiff's supervisor, Sergeant Hardy forwarded Plaintiff's complaints up the chain of command to Plaintiff's Lieutenants and Captains.  Throughout Plaintiff's career at Troop 7, Plaintiff directly reported harassment because of sex by Smyk and other male officers to Lieutenant Ron Hagan and Captain John Yeomans.

39.      When Plaintiff reported harassment to Sergeant Dean, he mocked Plaintiff and even encouraged Smyk's harassment of Plaintiff.

40.      Defendant, Captain Yeomans, Lieutenant Hagan, and Sergeant Dean took no

5

further action against Smyk. Defendant told Plaintiff to just steer clear of Smyk because this is how he is and he will just continue to bother Plaintiff.

### ii.    Vandalism of Plaintiff's Patrol Vehicle, Mailbox, and Uniform Hat

41.    Also, many times after she returned from vacations between June 2001, and approximately 2007, Plaintiff's patrol vehicle had flat tires, equipment missing, or lubricant on the door handles and steering wheel. In addition, salt was placed in the air vents of her vehicle to suggest that Plaintiff was "salty" because she produced arrest numbers higher than her less productive male peers.

42.    Plaintiff's mailbox also was vandalized with derogatory stickers and pictures.

43.    Plaintiff's uniform campaign hat was smashed several times and also shoved under the refrigerator in Troop 7's kitchen.

44.    Plaintiff reported these acts of vandalism to her vehicle, mailbox, and uniform campaign hat to Sergeant Hardy and her subsequent supervisors.

45.    From 2002 to approximately May 2007, Sergeant Hardy forwarded Plaintiff's complaints up the chain of command to Plaintiff's Lieutenants and Captains including Lieutenant Hagan.

46.    However, Defendant took no further action to investigate or address the vandalism directed toward Plaintiff.

### iii.    Discouragement of Arrest Rate

47.    Plaintiff produced arrest numbers higher than some male detectives doing criminal work 24 hours per day and 7 days per week. However, senior, male officers told Plaintiff to slow down because her arrests caused less productive males to fall below the Troop

6

average.

### iv.    Disparities in Death Notifications and Other Harassment By Sergeant Dean

48.    Again, in May 2007, Plaintiff became the first and the only female ever selected to be a Fatal Investigator in Defendant's Fatal Unit.

49.    Beyond one generic class on death notifications in the Academy, Defendant gave Plaintiff no additional victim service training to deliver death notifications in the Fatal Unit.

50.    Yet, Defendant provided additional victim service training to Troopers in the Victim Services Unit.

51.    At all times material hereto, Defendant's policy, custom, and practice was that a trained officer from the Victim Services Unit would deliver most death notifications.

52.    In the Fatal Unit, Defendant and Sergeant Barry Dean required Plaintiff to deliver more death notifications and investigate more child fatalities than her male peers in the Fatal Unit.  Defendant and Dean ordered Plaintiff to make death notifications that were not part of the call out procedure.  For example, Dean ordered Plaintiff to deliver alone a death notification of a four year old girl to her estranged father.  However, Defendant and Dean did not order Plaintiff's male peers in the Fatal Unit to go outside of the call out protocol to make death notifications.

53.    Defendant and Sergeant Dean also assigned Plaintiff to provide more death notifications of child fatalities than her male peers were assigned.

54.    Rather than assigning her only to deaths of strangers, Defendant and Sergeant Dean often assigned Plaintiff to provide more death notifications for the deaths of individuals whom she knew personally than her male peers in the Fatal Unit.

55.    For example, Dean ordered Plaintiff to perform an in-person identification of her

7

close friend who was the wife of Corporal Bill Matt. In so doing, Dean shook the bloody face of her corpse at Plaintiff and then dropped the body toward the ground before Plaintiff caught the lifeless body.

56.    By way of further example, Defendant ordered Plaintiff to stand in the blood of her close, personal friend, Georgetown Police Officer Chad Spicer, when he was murdered.

57.    Then, Dean ordered Plaintiff to search the vehicle for Corporal Matt's two-year old son. Dean purposely concealed the fact that the son already had been removed from the vehicle.

58.    In contrast, Defendant and Sergeant Dean generally did not assign Plaintiff's male peers in the Fatal Unit to provide death notifications for the deaths of strangers or individuals the male peers knew personally. Generally, Plaintiff's male peers in the Fatal Unit provided death notifications only when 1) they volunteered to do so or 2) spontaneously when a family member of the deceased arrived on the scene.

59.    Defendant and Sergeant Dean assigned to Plaintiff and allowed Plaintiff to maintain so many death notifications and fatalities without reassigning them to other members with less or no pending fatalities. Dean and Plaintiff's male peers in the Fatal Unit mockingly referred to Plaintiff as "The Death Cloud" and "The Black Cloud."

60.    Defendant's Executive Staff was aware of the inequitable amount of death notifications, child fatality investigations, and more unpleasant death notifications that Sergeant Dean and the Sergeant who succeeded him in the Fatal Unit assigned to Plaintiff compared to her male peers.

61.    However, Defendant and its Executive Staff took no action to correct the disparate

treatment of Plaintiff compared to her male peers.

62.     When he was her immediate supervisor, Dean taunted Plaintiff on a near daily basis. For example, Dean called Plaintiff's husband gay nearly every single day that she went into the office.

63.     After the fatalities of Corporal Maat's wife and son, Defendant transferred Maat's co-worker Dean out of the Fatal Unit.

64.     After Dean was transferred, he still came to Troop 7, and harassed Plaintiff.

65.     When Dean was Plaintiff's immediate supervisor and thereafter, Plaintiff reported Dean to Captain Yeomans and the Lieutenants in the Fatal Unit.

**v.     Defendant Prohibited Plaintiff from Training Its Officers.**

66.     Plaintiff earned certification and re-certification as a Krav Maga law enforcement instructor which were paid for with Defendant's training funds. Defendant allowed Plaintiff to teach these defensive tactics to other law enforcement agencies including the Town of Ocean View's Police Department. That Department sent a letter to Defendant's administration to inform Defendant how impressed it was with Plaintiff and the training she provided.

67.     However, Defendant prevented Plaintiff from teaching defensive tactics to Defendant's Troopers. Yet, Defendant and Captain Galen Purcell permitted lower ranking males, including Trooper Ricardo Torres to teach defensive tactics to Defendant's Troopers.

**vi.     Understaffing of Female Led Shifts**

68.     There were two rotations per shift. At Troop 4, A and B shifts both were on the same rotation, and C and D shifts both were on another rotation. At Troop 4, Captain Rodney Layfield, a male, assigned approximately just eight (8) members each in the female led A and B

shifts to patrol during a rotation while he assigned approximately just ten (10) members each in the male led C and D shifts to patrol during a rotation.

69.     This lowered proactive patrol time for and increased overtime requests from Plaintiff's understaffed B shift.

70.     The male Sergeants in charge of the C and D shifts each had less seniority as a Sergeant than Plaintiff.

71.     Plaintiff informed Lieutenant John McColgan, Captain Rodney Layfield, and other male supervisors of this understaffing.  She asked for each shift or rotation to have an equal number of members.

72.     Defendant's policy, custom, or practice was that the Senior Sergeant received any extra member.  Plaintiff was the Senior Sergeant at Troop 4.

73.     However, Defendant took no action to correct the imbalance favoring Plaintiff's less senior, male, peer Sergeants and their shifts.

vii.     **Housing Benefit and Commuting Pay for Male Officers in the EPU**

74.     In the EPU, Defendant allowed male officers to live in mansions on large estates in New Castle County.

75.     When she was assigned to the EPU, Plaintiff requested the same free housing benefit in New Castle County ("NCC") given to her male peers.  In response, male Lieutenant Michael J. Wysock told a male Sergeant, "She can suck my dick."

76.     When Plaintiff refused, she was required to pay $500 monthly to live with a NCC homeowner.

77.     Plaintiff even requested the housing benefit from Colonel Nathaniel McQueen, Jr.

However, he told her that this was something he did not control and no houses were available.

78.     However, Plaintiff's male peers in the EPU 1) were given free use of NCC houses or 2) were allowed to live in Sussex County and receive pay to commute.

79.     For example, after the wife of male Captain Jason Sapp found out he was having an affair with one of his civilian co-workers, Defendant provided and allowed Sapp to live in a mansion in a matter of a few days.

80.     By way of further example, Plaintiff's male peer, Trooper Andy Goode, was allowed to commute from Sussex County and was paid overtime for his commuting time. Plaintiff informed Colonel McQueen that Goode was seeking and receiving overtime pay to commute from Sussex County to New Castle County for every shift that he worked in the EPU.

81.     Receiving pay to commute was and still is against Defendant's Standard Operating Procedures.

82.     Defendant presently pays male members of the EPU to commute.

viii.   **Sexually Harassing Photo, Message, and Rumors About Plaintiff**

83.     When Plaintiff was selected for the EPU, male troopers placed a photo and a message in her mailbox falsely claiming that Plaintiff performed oral sex on Delaware's Speaker of the House to gain the prestigious EPU job.

84.     In or around November 2016, Sergeant J.B. Mitchell, a male, created and spread unlawful, sexually harassing, false rumors 1) that Plaintiff was reassigned from the EPU to Patrol because Plaintiff had been sleeping with male officers under her command and 2) that once re-assigned to Patrol, Plaintiff worked on the road (rather than at a desk) in order to have extra-marital sex with her male subordinates.

11

85.     Plaintiff confronted Sergeant Mitchell about his unlawful, sexually harassing, false rumors.  However, he later laughed to Plaintiff's peers about the fact that she confronted him, and he continued to spread these unlawful, sexually harassing, false rumors about her.

86.     Plaintiff reported Mitchell's unlawful, sexually harassing, false rumors about her to Captain Rodney Layfield.  Layfield told Plaintiff that she needed to have thicker skin and not let what someone else said about her bother her.  Layfield never addressed Sergeant Mitchell formally about his unlawful, sexually harassing, and false rumors.

87.     Instead, Layfield joked about Mitchell's unlawful, sexually harassing, and false rumors about Plaintiff to Plaintiff's male peers and her lower ranking, male co-workers.

88.     In addition, Major John R. Evans, a male, confronted Plaintiff about a false rumor that Plaintiff was having an extra-marital affair with Trooper Kevin Becker.  Evans admitted that he knew the rumor was false but felt that Plaintiff should be made aware of it.

89.     In response, Plaintiff cried and said that Defendant is making a hostile work environment for her because no one had done anything to protect her from these false rumors.

90.     In response, Evans told Plaintiff she should not let what people say bother her, she should have thicker skin, and this is just the way things happen.

ix.     **Sexual Advances on Out-of-State Business Trip**

91.     Also, when Plaintiff was in the EPU, Plaintiff reported several incidents of sexual harassment by male Corporal Jim Rossi to Colonel McQueen.

92.     Plaintiff was so uncomfortable with Rossi's harassment of her that she rearranged her travel schedule to reduce her time alone in a vehicle with Rossi.  For example, for a national governors' convention in the Midwest, Rossi was supposed to leave the same day that Plaintiff

flew out for this trip.  But because she was uncomfortable with being alone with Rossi, Plaintiff flew ahead without Rossi to a Midwest location approximately five hours by car from the convention and met Rossi there to drive a shorter distance together but still allow enough time for them to conduct pre-arrival preparation and coordination of the arriving parties.

93.     While driving to the convention in the Midwest, Rossi pretended to brake hard, pretended to merely hold Plaintiff back in the seat, reached his arm across the front seat of the car, and put his open hand on Plaintiff's breast numerous times.

94.     Plaintiff reported this by phone to Colonel McQueen.  During that call, she informed the Colonel that if something wasn't done, she was going to take it above his head because she was done with the inappropriate actions of Jim Rossi.

95.     Colonel McQueen told her to try to calm down and just make sure the Governor did not know about her problem.  By the end of the week, Plaintiff had reported Rossi several more times to McQueen on a nearly daily basis.

96.     Rossi wanted to drive their EPU vehicle to the Midwest.  Once Plaintiff landed, she checked Rossi's status, and he had not left.  He then said he "had business in Ohio." Plaintiff later learned that Rossi did this to meet a female for the night.

97.     Not trusting Rossi's motives to stay overnight in a different state, Plaintiff paid for her own hotel room that evening out of her own money because there was no reason for Rossi and Plaintiff to waste money from the budget for the extra day's stay.

98.     After the Governor and the First Lady each had departed the convention and began their return trips to Delaware, Plaintiff returned to her hotel room to find out Rossi cancelled his hotel room reservation.

99.   Though no one is allowed to obtain keys to another officer's room, Rossi obtained an additional key from the hotel's front desk and placed his belongings in Plaintiff's room.

100.   Rossi actually had lain in Plaintiff's hotel bed and made an indentation on it.

101.   Rossi followed Plaintiff into her hotel room, said he had checked out early, and declared that he was going to stay in Plaintiff's room with her for the night, and they would leave together in the morning.

102.   Plaintiff informed Corporal Rossi that was not happening and told him to pack the car because they were returning to Delaware immediately.

103.   Plaintiff then locked herself in the bathroom and called First Lady Markell. Plaintiff told the First Lady what Rossi had done and that she was locked in the bathroom waiting for him to get his items out of her room.

104.   First Lady Markell was furious and told Plaintiff that she had her backing to have him removed if the Colonel would not do it.

105.   Then, Plaintiff called the Colonel and told him that she already had spoken to the First Lady, and that Plaintiff and Rossi were driving back to Delaware immediately.

106.   When Plaintiff returned to Delaware and unpacked, she found that she was missing a pair of her underwear.  Plaintiff made the Colonel aware of this as well.

107.   Rossi often bragged about having underwear from each woman with whom he claimed to have had sexual intercourse.

108.   Colonel McQueen met with Rossi and Plaintiff individually.  He met first with the lower ranking male officer, Corporal Rossi, and then with the higher ranking female officer, Plaintiff.

14

109.     Rossi falsely alleged that Plaintiff met a man while traveling and used the trip to have a "hook up." In reality, the exact opposite was true.

110.     Yet , Colonel McQueen questioned Plaintiff about Rossi's false allegations of her alleged "hook up."

111.     Plaintiff reported to Colonel McQueen the following: Rossi arrived a day late because he stopped in another state apparently to spend the night with another female.  When Rossi did this, Plaintiff went down to the hotel's front desk that night and paid for her hotel room out of her own pocket because she refused to be part of his misappropriation of funds and have the State pay for her to stay an extra night because Rossi was trying to have sexual intercourse on the job.

112.     Colonel McQueen did not take Plaintiff's complaint seriously.  McQueen did not seek to question the male Corporal Rossi about the female Sergeant Oldham's report of Rossi's misconduct and misappropriation of funds after he questioned Plaintiff about Rossi's false report of misconduct by her.

113.     Defendant did not reimburse Plaintiff for the hotel room she was required to pay for out of her own pocket to avoid the unlawful, sexual advances of her male co-worker, Rossi.

114.     Defendant took no disciplinary action against Rossi.  Defendant merely transferred him out of the EPU.

115.     Defendant then awarded Rossi the new assignment of his choice.

116.     When Rossi admitted that he lost his division-issued bulletproof vest, he was not disciplined for losing something so valuable and potentially allowing it to fall into the wrong hands.  Nor did Defendant require Rossi to replace the vest or work in a capacity that required

15

him to wear one.

117.    Instead, Defendant reassigned Rossi to an easier, day job where he again was allowed to continue to abuse overtime and engage in more inappropriate actions with others.

**C.    Retaliation and More Harassment of Plaintiff Because of Her Sex (2016-2018).**

**i.    Threat of Discharge and Transfer to Least Productive Shift.**

118.    Plaintiff repeatedly reported to Colonel McQueen and other superiors for years the sex-based harassment, the ongoing overtime fraud, as well as officers drinking on the job when assigned to protect the Governor, use of fictitious license plates on official vehicles in order to elude speeding and traffic light camera tickets, and other wrongdoing in the EPU. However, Defendant did not address any of this wrongdoing.

119.    Unable to stop and unwilling to participate in the shameful fraud and other wrongdoing and in an attempt to protect her own mental, emotional, and spiritual well-being, Plaintiff requested a transfer from the EPU in or around October 2016.

120.    In response, Major John R. Evans, a male, told Plaintiff, "This is a career ender."

121.    In November 2016, DSP transferred Plaintiff to Troop 4's least productive shift: B Shift.

**ii.    Lieutenant McColgan's Written Harassment of Plaintiff at Troop 4.**

122.    At Troop 4, on a nearly daily basis, Lieutenant John McColgan, a male, harassed and belittled Plaintiff in writing.

123.    By written e-mail, McColgan painted a picture of Plaintiff and her shift as being inept, even at tasks as simple as logging an empty wallet into temporary evidence. For example, McColgan wrote, "I sure hope that when the defendant went to jail, he didn't ask where his

16

$100.00 went to."

124.     Plaintiff made multiple reports by e-mail to Captain Layfield about this e-mail and additional, derogatory and belittling emails that McColgan sent to her.

125.     Male Captain Layfield told Plaintiff that McColgan just has a weird personality, and nobody likes him.  Layfield excused McColgan by saying he is "just a little weird and has no communication skills." Layfield gave Plaintiff excuses and told her, "Don't let it bother you. That's just McColgan.  He's a dick to everyone."

126.     In essence, Layfield told Plaintiff to accept McColgan's harassment of her.

127.     With no protection from Layfield, McColgan's harassing emails to Plaintiff became more frequent.

128.     McColgan did not harass male sergeants or their shifts in the same derogatory manner or nearly as frequently as he did Plaintiff.

129.     Layfield admitted to Plaintiff that he did not let Lieutenant McColgan in the same room with male Sergeant J.B. Mitchell because they were so volatile when they were together.

130.     At a Sergeants' meeting, McColgan criticized Sergeant Mitchell for being too busy to execute a warrant attempt when there was nothing else significant to prevent him from doing so.  Publicly, in front of everyone at the meeting, Sergeant J.B. Mitchell made a very direct, sarcastic, and insubordinate comment to McColgan about warrant attempts.

131.     Layfield allowed male Sergeant Mitchell to make sarcastic remarks about and toward McColgan.

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

17

### iii.  Physical Assault of Plaintiff's Breasts.

132.   On or about November 14, 2017, male Lieutenant John McColgan unfairly criticized Plaintiff's subordinate for passing on an unrequired warrant execution.

133.   The next day, McColgan called Plaintiff into his office to talk to Plaintiff.  There, he and Plaintiff heatedly disagreed about the competence of her shift and Plaintiff.

134.   After Plaintiff defended her shift, McColgan with a very angry demeanor, yelled at Plaintiff.  When she stood up, he came around his desk, said this conversation is over, and told her to get out of his office.  When Plaintiff asked why he was acting this way, McColgan put both of his hands on both of her breasts and forcefully pushed Plaintiff out of his office while she was wearing the Delaware State Police uniform.

135.   In the hallway, Plaintiff asked McColgan why he was pushing her.  McColgan was still acting in a very hostile manner.  Hearing McColgan's yelling, Lieutenant Berry called McColgan into the next office.

136.   McColgan has not pushed any male Sergeants.

137.   McColgan immediately began speaking about Plaintiff in a derogatory manner and rejecting and returning Plaintiff's police reports for alleged deficiencies for which he never previously rejected or returned her reports.

### iv.  False Accusations of Misconduct: Insubordination & Conduct Unbecoming an Officer.

138.   On November 15, 2017, male Captain Rodney Layfield falsely accused Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to McColgan.

139.   In response, Plaintiff told Layfield that she in turn wanted McColgan brought up on the same charge of Conduct Unbecoming an Officer for pushing her in the breasts.

140.    In response, Layfield became very angry, yelled at Plaintiff, and told her she was not going to bring charges against McColgan.  Layfield said that he was not going to stand for Plaintiff throwing around the "female card."

    **v.**    **Mental Torture and Visual, Sexual Harassment.**

141.    Immediately after that, Layfield and McColgan mentally tortured Plaintiff for her next two entire shifts.  Layfield and McColgan made Plaintiff sit in a conference room and tried to make her think that she was the problem rather than a victim of unlawful sexual harassment.

142.    Layfield and McColgan tried to make Plaintiff think that she was unable to handle normal, work-related stress rather than unlawful, sexual harassment.  Layfield told her that she could not handle the stress, needed help, had suffered too much stress over her career, and needed to call HQ for help.

143.    Layfield called HQ on his own.  He told Plaintiff that he had to make them aware that she was having a rough time and felt it was his responsibility to try to get her help.

144.    In reality, Layfield was not qualified to determine that Plaintiff's mental health was a concern.  Furthermore, he had no training to make such a determination.

145.    Also, in a meeting with Layfield, McColgan, and DiSilvestro, McColgan leaned back in his chair, grabbed his crotch, obscenely gestured toward Plaintiff, and told Plaintiff, "Don't flatter yourself."

146.    When McColgan's two (2)-day long harassment finally drove Plaintiff to tears, Layfield told Plaintiff, "I am worried about your mental health."

147.    In contrast, Plaintiff previously reported to Layfield that Corporal Andy Partyka had become drunk, drove his police vehicle to his girlfriend's house, tried to break into her

19

home, expressed that he did not want to live, and sent his girlfriend a picture of himself with his division-issued gun in his mouth. In response, with Sergeant Mitchell present, Captain Layfield merely told Partyka not to have contact with his girlfriend and Partyka's suicidal ideation would remain in-house. There, Layfield told Plaintiff that she did a great job of not reporting this to anyone else, the matter would stay "in-house," and "we take care of our own."

148.   Sergeant Mitchell harassed Plaintiff for reporting Partyka's suicidal ideation to Captain Layfield.

149.   Plaintiff reported Mitchell's harassment to Layfield. Layfield took no action against Mitchell. Layfield again told Plaintiff not to let what other people said about her bother her.

150.   On or about November 22, 2017, McColgan had DiSilvestro unfairly write up Plaintiff for Failure to Arrest when an Arrest Was Warranted despite the fact that the domestic abuse victim did not want to press charges.

151.   Further, none of Plaintiff's male peer Sergeants at Troop 4 even handled domestic abuse incidents, took paper complaint calls, or worked with their shifts from the 911 calls all the way through the arrests like Plaintiff did.

**vi.   Alteration of Job Responsibilities: Involuntary Transfer of Plaintiff and Her Shift.**

152.   Layfield told detectives that he was not going to stop until he got Plaintiff out of Troop 4. He shared their closed-door conversations with numerous sergeants and lower ranking officers at Troop 4.

153.   At all times material hereto, it was DSP's custom not to transfer senior officers unless they requested it.

20

154.    Yet, in late 2017, Layfield transferred Plaintiff's entire shift except her male assistant from her.

155.    Then on January 29, 2018, Layfield violated policy by calling Plaintiff on vacation and prematurely told Plaintiff that she was being transferred to Troop 5, effective March 4, 2018.

156.    Troop 5 was the Troop farthest from Plaintiff's home.

157.    Troop 5 is in the same jurisdiction where Plaintiff's brother was found dead on the roadside on July 4, 2016.

158.    Defendant, Colonel McQueen, and Captain Layfield transferred Plaintiff to the same jurisdiction where Plaintiff's brother was found dead on the roadside to further harass Plaintiff.  In so doing, Defendant, Colonel McQueen, and Captain Layfield intentionally caused Plaintiff mental and emotional harm.

159.    Defendant has not involuntarily transferred any other Sergeant from patrol without disciplinary action.

160.    Though Plaintiff was the most senior Patrol Sergeant in Sussex County, Defendant involuntarily transferred Plaintiff on or about January 29, 2018.

**vii.    Replacement of Plaintiff With Less Experienced Male.**

161.    Defendant replaced Plaintiff at Troop 4, with a brand new Sergeant, a male.

**viii.    More False Accusations of Misconduct, False Rumors, and Disclosure of Private Facts.**

162.    On February 7, 2018, Plaintiff's doctor ordered Plaintiff on medical leave indefinitely for Stress and Depression.

163.    On February 9, 2018, Plaintiff e-mailed her doctor's note to Defendant and

21

Captain Layfield.

164.    On February 9, 2018, Captain Layfield acknowledged by e-mail Plaintiff's medical leave and that Human Resources also was made aware.

165.    Yet, Layfield attacked Plaintiff more with false accusations of misconduct and false rumors.

166.    After hours, at approximately 5:30 p.m., Layfield texted a copy of Plaintiff's doctor's note intended for a person unauthorized to receive it.

167.    In a second text, Layfield falsely accused Plaintiff of using the services of a "diet doctor."

168.    In a third text, Layfield falsely claimed that he was notifying Headquarters. Earlier, he admitted that he already had done this.

169.    Layfield also illegally disclosed to a Troop 5 Lieutenant that Plaintiff was out for mental issues.  Specifically, Layfield called and told this Lieutenant that Plaintiff was out for "10-81." This is Defendant's police code for a possible mentally handicapped subject. Layfield also told this Lieutenant that Plaintiff was "nuts."

170.    This Lieutenant was not in Captain Layfield's chain of command.

171.    This Lieutenant had no right to know Plaintiff's private medical information.

172.    Layfield's acts violated Defendant's privacy policy and HIPPA.  Defendant's officers, including Layfield, receive annual training on HIPPA.

173.    Layfield's acts constituted Conduct Unbecoming an Officer.

174.    Defendant allowed its male troopers to spread false rumors about Plaintiff that she was not at work because Plaintiff "lost her mind."

175.    These false accusations, false rumors, and public disclosure of private facts injured Plaintiff's professional reputation.

**D.    Forced Medical Leave & Involuntary Separation from Employment (2018).**

176.    Defendant forced Plaintiff out on medical leave on February 9, 2018.

177.    Between approximately February 9th and December 31st, 2018, Defendant terminated Plaintiff's e-mail access to its e-mail system and deleted all of her e-mails without her consent.

178.    In contrast, Defendant does not terminate its male Troopers' e-mail access to its e-mail system until after they retire.

179.    Defendant's Standard Operating Procedures allow Troopers in need of additional leave time to solicit and receive additional, unused leave time from their co-workers.

180.    However, between approximately February 9th and December 31st, 2018, Defendant prohibited Plaintiff from soliciting and receiving additional, unused leave time from her co-workers.

181.    On October 31, 2018, DSP's Colonel Nathaniel McQueen, Jr. informed Plaintiff in writing that Defendant was separating her from employment effective December 31, 2018 ("October 31, 2018 notice of separation").

182.    Plaintiff remained on leave until December 31, 2018.

183.    On December 31, 2018, Defendant and McQueen separated Plaintiff from employment with Defendant.

184.    On December 31, 2018, Plaintiff's employment with Defendant ended.

185.    By issuing Plaintiff the October 31, 2018 notice of separation, Defendant and

McQueen violated Defendant's leave policy, custom, and practice by making no attempt to help Plaintiff to return to work and by deciding to separate her from employment before her earned and accrued leave time even was exhausted.

186.   Defendant has allowed most male officers who retire to use their earned and accrued, paid leave for approximately one year or more before their eventual retirement date. However, on October 31, 2018, McQueen notified Plaintiff that he was separating her from employment before her earned and accrued leave was even exhausted, in just two (2) months, effective December 31, 2018.

187.   Though Layfield claimed to be worried about Plaintiff's mental health, he and Defendant never requested Plaintiff return her division-issued weapon.  Nor did Defendant contact Plaintiff at all between the time she went out on leave on February 9, 2018, and McQueen's October 31, 2018 notice of separation.

**E.    Workplace Composition.**

188.   Currently and at all times material hereto, Defendant employs approximately 716 sworn police officers.

189.   Currently and at all times material hereto, Defendant employs approximately ninety (90) female police officers.

190.   Currently and at all times material hereto, Defendant employs approximately 626 male police officers.

## IV.  INJURIES AND DAMAGES

191.   As a result of the discriminatory treatment she experienced, Plaintiff is suffering from severe emotional distress which is or has been marked by insomnia; vomiting; extreme

weight loss; lack of focus and mental errors in everyday life; feelings of despondency and depression; social anxiety and lack of social interaction; loss of interest in leisure activities; loss of intimacy; feelings of agitation, irritability, and anger with herself and others; flashbacks; nightmares; weight gain; and crying. On December 28, 2019, she was diagnosed with Post-Traumatic Stress Syndrome by her Licensed Psychologist, Samuel Romirowsky, Ph.D.

192. Plaintiff has been required to pay for medical visits and medications for which she otherwise would not have been required to pay.

193. As a direct and proximate cause of Defendant's actions, Plaintiff has suffered the decreased benefits of employment, lost wages, decreased employment and earnings opportunities, reduced pension, lost life insurance, and other lost benefits; medical expenses; humiliation, embarrassment, injury to reputation, severe emotional distress; and other pecuniary and non-pecuniary losses and permanent injuries.

## V. <u>OTHER ALLEGATIONS REGARDING DEFENDANT'S CONDUCT</u>

194. The actions of the Defendant were deliberately, intentionally, willfully, purposefully, and knowingly done in violation of federally protected rights. Defendant either knew or showed a negligent or reckless disregard for the matter of whether its conduct violated federal and state law rights. Its actions were outrageous and taken with evil or improper motive, in bad faith, out of personal animus, or motivated by bias and without any reasonable grounds to support them. Its actions were wanton and malicious or taken with reckless indifference to rights protected under federal and state law. Plaintiff's sex and/or protected activity made a difference in all actions adverse to her. Plaintiff's sex, and/or protected activity was a motivating or determinative factor in all actions adverse to her.

## VI. CLAIMS

### COUNT I
### HOSTILE WORK ENVIRONMENT (SEX - TITLE VII AND DDEA)

195.    Plaintiff repeats and realleges all paragraphs set forth above.

196.    Because of her sex, Plaintiff suffered intentional discrimination which was severe or pervasive, regular and continuous.  This detrimentally affected her, and it would do so for a reasonable person of the same sex in her position.

197.    The totality of the circumstances proves the existence of a hostile or abusive working environment severe enough to affect the psychological stability of a female worker.

198.    The acts identified herein were severe and pervasive, regular and continuous, and they created an intimidating, hostile, or offensive work environment.

199.    The discriminatory acts not specifically referenced in Counts II through V were part of an ongoing practice or pattern of discrimination by the Defendant.  The discriminatory acts that are not specifically referenced in Counts II through V are not individually actionable.

200.    Under all the circumstances, Plaintiff has been illegally discriminated against in the terms and conditions of her employment, and otherwise harassed, by a discriminatory, hostile, and abusive work environment which was created, approved, and tolerated by management because of sex.

201.    Plaintiff's statutory right to be free of sex discrimination has been denied under Title VII and the DDEA.

### COUNT II
### INVOLUNTARY TRANSFER (SEX - TITLE VII AND DDEA)

202.    Plaintiff repeats and realleges all paragraphs set forth above.

203.    Plaintiff is a female.  Defendant discriminated against and involuntarily transferred her to Troop 5, on January 29, 2018, effective March 4, 2018.  There is a causal connection between Plaintiff's sex and Defendant's discrimination.  Any non-discriminatory reason given by Defendant is a pretext for sex discrimination.

204.    Any stated legitimate non-discriminatory reason offered by the Defendant for its actions is a pretext for intentional discrimination based on sex.  Any reason offered by Defendant is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that Defendant did not act for the asserted non-discriminatory reason.

205.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was Plaintiff's sex.  In the alternative, any reasons provided by the Defendant for the treatment of Plaintiff are pretextual and a cover up for sex discrimination.

206.    Plaintiff's rights were violated under Title VII and the DDEA, because she was involuntarily transferred or otherwise discriminated against on the basis of her sex.

207.    Plaintiff's statutory right to be free of sex discrimination has been denied under Title VII and the DDEA.

**COUNT III**
**INVOLUNTARY TERMINATION OF EMPLOYMENT (SEX - TITLE VII AND DDEA)**

208.    Plaintiff repeats and realleges all paragraphs set forth above.

27

209.    In or around October 2016, Defendant and Major Evans warned or threatened that Plaintiff could be discharged.

210.    On January 29, 2018, Defendant, Colonel McQueen, and Captain Layfield and altered Plaintiff's job responsibilities by transferring Plaintiff to Troop 5, effective March 4, 2018.

211.    On November 15, 2017, Defendant and Captain Layfield issued Plaintiff unsatisfactory job evaluations or falsely accused Plaintiff of misconduct by falsely accusing Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to Lieutenant McColgan.

212.    Defendant knowingly permitted conditions of employment which were so intolerable that a reasonable person subject to them would be forced out of work.  Plaintiff was forced to go out on medical leave.  The sole reason that Defendant knowingly permitted these conditions of employment was Plaintiff's sex.

213.    On December 31, 2018, Defendant separated Plaintiff from employment and involuntarily terminated her employment.

214.    As a direct and proximate result of the discriminatory treatment she experienced, Plaintiff is suffering the injuries and damages listed in section IV above.

215.    Plaintiff's statutory right to be free of discrimination because of sex has been denied under Title VII and the DDEA.

**COUNT IV**
**INVOLUNTARY TRANSFER IN RETALIATION**
**FOR OPPOSING ILLEGAL PRACTICES (SEX - TITLE VII AND DDEA)**

216.    Plaintiff repeats and realleges all paragraphs set forth above.

217.    Plaintiff opposed practices made illegal by Title VII and the DDEA.  Defendant

retaliated against her for her opposition and involuntarily transferred her to Troop 5, on January 29, 2018, effective March 4, 2018.  There is a causal connection between Plaintiff's opposition and Defendant's retaliation.

218.    Any stated legitimate non-retaliatory reason offered by the Defendant for its actions is a pretext for retaliation for opposing discrimination based on sex.  Any reason offered by Defendant is unworthy of credence because Plaintiff can demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the proffered legitimate reasons that a reasonable fact finder can rationally find them unworthy of credence and hence infer that Defendant did not act for the asserted non-discriminatory reason.

219.    Alternatively, Plaintiff can demonstrate pretext because the natural probative force of all direct and circumstantial evidence establishes that it is more likely than not that a motivating or determinative cause of the adverse employment action was Plaintiff's protected activity.  In the alternative, any reasons provided by the Defendant for the treatment of Plaintiff are pretextual and a cover up for retaliation and sex discrimination.

220.    Plaintiff's rights were violated because she was involuntarily transferred or otherwise discriminated against in retaliation for opposing illegal practices and on the basis of her sex.

221.    Plaintiff's statutory right to be free of retaliation for opposing sex discrimination has been denied under Title VII and the DDEA.

**COUNT V**
**INVOLUNTARY TERMINATION OF EMPLOYMENT IN RETALIATION**
**FOR OPPOSING ILLEGAL PRACTICES (SEX - TITLE VII AND DDEA)**

222.    Plaintiff repeats and realleges all paragraphs set forth above.

29

223.   In or around October 2016, Defendant and Major Evans warned or threatened that Plaintiff could be discharged.

224.   On January 29, 2018, Defendant, Colonel McQueen, and Captain Layfield altered Plaintiff's job responsibilities by transferring Plaintiff to Troop 5, effective March 4, 2018.

225.   On November 15, 2017, Defendant and Captain Layfield issued Plaintiff unsatisfactory job evaluations or falsely accused Plaintiff of misconduct by falsely accusing Plaintiff of Insubordination and Conduct Unbecoming an Officer for defending her shift to Lieutenant McColgan.

226.   Defendant knowingly permitted conditions of employment which were so intolerable that a reasonable person subject to them would be forced out of work. Plaintiff was forced to go out on medical leave. The sole reason that Defendant knowingly permitted these conditions of employment was Plaintiff's complaints of sex discrimination.

227.   On December 31, 2018, Defendant separated Plaintiff and involuntarily terminated her employment.

228.   As a direct and proximate result of the discriminatory treatment she experienced, Plaintiff is suffering the injuries and damages listed in section IV above.

229.   Plaintiff's statutory right to be free of retaliation for her complaints of discrimination because of sex has been denied under Title VII and the DDEA.

WHEREFORE, Plaintiff prays that the Court grant the following relief:

A.   Enter a declaratory judgment declaring the actions of Defendant to be violations of federal and state law;

*[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK.]*

30

B.      Issue a permanent injunction requiring Defendant to expunge Plaintiff's personnel files of any derogatory, false, or misleading information relating to this matter;

C.      Award damages in an amount to be determined at trial for lost salary, back pay and front pay, including all incremental pay increases that Plaintiff would have received;

D.      Award damages for reduced pension;

E.      Award damages for lost life insurance and other lost benefits;

F.      Award compensatory damages for the $500 monthly rents Plaintiff was required to pay to live with a NCC homeowner while she was assigned to the EPU;

G.      Award compensatory damages for out-of-pocket medical expenses;

H.      Award compensatory damages for emotional distress, humiliation, embarrassment, and injury to reputation;

I.      Award punitive damages under Title VII and the DDEA;

J.      Award reasonable attorney's fees, costs, and pre-judgment and post-judgment interest against Defendant; and

K.      Require such other and further relief as is equitable, just, and proper.

LaROSA & ASSOCIATES LLC

/s/ John M. LaRosa
**JOHN M. LaROSA, ESQ.**
Delaware Bar No. 4275
1225 King Street, Suite 802
Wilmington, DE 19801-3246
(302) 888-1290 (telephone)
(302) 655-9329 (fax)
JLR@LaRosaLaw.com

*Attorney for Plaintiff Nicole L. Hantz*

Dated: July 14, 2021

31

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| NICOLE L. HANTZ,<br>f/k/a NICOLE OLDHAM, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 21-801-RGA |
| | ) | |
| DIVISION OF STATE POLICE,<br>DEPARTMENT OF SAFETY &<br>HOMELAND SECURITY,<br>STATE OF DELAWARE, | ) | |
| | ) | |
| Defendant. | ) | |

### DEFENDANT'S ANSWER TO FIRST AMENDED COMPLAINT

Defendant Division of State Police, Department of Safety & Homeland Security, State of Delaware ("DSP"), by and through undersigned counsel, hereby responds as follows to Plaintiff Nicole L. Hantz f/k/a Nicole Oldham's ("Plaintiff") Complaint as follows:

1.     Plaintiff's introductory statement sets forth Plaintiff's characterization of her claims, to which no response is required.   Any inference that DSP engaged in unlawful employment practices, retaliation, and/or discrimination is expressly denied.

### I.     JURISDICTION AND VENUE[1]

2.     This paragraph states legal conclusions to which no response is required.   To the extent a response is deemed necessary, the allegations are denied.

3.     This paragraph states legal conclusions to which no response is required.   To the extent a response is deemed necessary, the allegations are denied.

---

[1] DSP's Answer restates the headings from the First Amended Complaint for the Court's convenience. DSP denies any facts alleged or implied in the headings of the Complaint.

4.      This paragraph states legal conclusions to which no response is required.  To the extent a response is deemed necessary, the allegations are denied.

5.      This paragraph states legal conclusions to which no response is required. By way of further response, Plaintiff's Charge of Discrimination, the Notice of Right to Sue, and original Complaint in this matter are documents that speak for themselves.  To the extent a response is deemed necessary the allegations are denied.

6.      This paragraph states legal conclusions to which no response is required.  To the extent a response is deemed necessary, the allegations are denied.

II.     **THE PARTIES**

7.      Admitted, upon information and belief.

8.      Plaintiff was hired by DSP on July 26, 2002.  Plaintiff retired on January 1, 2019. To the extent a further response is deemed necessary the allegations in this paragraph are denied.

9.      DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

10.     Admitted.

11.     Admitted.

III.    **FACTS GIVING RISE TO THE ACTION**

12.     Admitted.

13.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

14.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph. To the extent a further response is deemed necessary the allegation in this paragraph is denied.

15.     On April 20, 2003, Plaintiff completed her training at the DSP Academy, was promoted to Trooper, and assigned to Troop 7 in Lewes, DE. To the extent a further response is deemed necessary the allegations in this paragraph are denied.

16.     On July 26, 2004, Plaintiff was promoted to Trooper First Class. To the extent a further response is deemed necessary the allegation in this paragraph is denied.

17.     Admitted.

18.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph. To the extent a response is deemed necessary the allegation in this paragraph is denied.

19.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph. To the extent a response is deemed necessary the allegation in this paragraph is denied.

20.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph. To the extent a response is deemed necessary the allegation in this paragraph is denied.

21.     In 2005 and 2006 Plaintiff received the Mothers Against Drunk Driving ("MADD") award for aggressively pursuing DUIs in the State of Delaware. Additionally, Plaintiff received a Lifesaving Award in 2006, a Citizen's Letter of Thanks in 2008, and a Commendation Letter from the Superintendent in 2009. To the extent a further response is deemed necessary the allegations in this paragraph are denied.

22.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

23.     On June 27, 2011, Plaintiff was promoted to Sergeant.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

24.     On April 11, 2011, Plaintiff served as acting Sergeant at Troop 7.  On June 27, 2011, Plaintiff was officially promoted to rank of Sergeant and supervised D Shift at Troop 7.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

25.     Admitted.

26.     Plaintiff was assigned to the Governor's Executive Protection Unit ("EPU") from January 2013 through October 2015.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

27.     Denied.

28.     Plaintiff was assigned to the B Shift at Troop 4 from October 2015 through January 2018.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

29.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.  To the extent a response is deemed necessary the allegation in this paragraph is denied.

30.     Denied.

31.     Denied.

32.     Denied.

33.     Denied.

34.     Denied.

35.     Denied.

36.     Denied.

37.     Denied.

38.     Denied.

39.     Denied.

40.     Denied.

41.     Denied.

42.     Denied.

43.     Denied

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     All Troopers, including Plaintiff, received at least four hours of victim services' training at the Academy.  By way of further response, all Troopers in the Crash Reconstruction Unit ("CRU"), which Plaintiff refers to as the Fatal Unit, are provided the same training, and no Trooper assigned to CRU receives any additional or special victim services training.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

50.     Denied.

51.     DSP does not have any control or the ability to predict the timing or frequency of tragic collisions and related critical and/or death notifications.  Troopers assigned to CRY are

required to be on-call on a rotational basis, and Plaintiff's on-call responsibilities were the same as any other Trooper assigned to CRU.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

52. Denied.

53. Denied.

54. Denied.

55. DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of whether Plaintiff was a close friend of the wife of Corporal Maat.  The remaining allegations in this paragraph are denied.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

60. Denied.

61. Denied.

62. Denied.

63. Sergeant Dean was transferred out of CRU in 2008, which was the same year as the fatalities of Corporal Maat's wife and son.  To the extent a further response is deemed necessary the allegations are denied.

64. Denied.

65. Denied.

66.    DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.  To the extent a response is deemed necessary the allegations are denied.

67.    DSP follows the Federal Law Enforcement Training Center ("FLETC") model of defensive tactics.  Upon information and belief, Plaintiff was not certified in this model, and therefore, would not have been selected to instruct DSP's defensive tactic courses.  The remaining allegations in this paragraph are denied.

68.    Admitted that there are two rotations per shift, and that, at Troop 4, A and B shifts were on the same rotation, and C and D shifts were on another rotation.  The remaining allegations in this paragraph are denied.

69.    Denied.

70.    Denied.

71.    Denied.

72.    Denied.

73.    Denied.

74.    DSP requires its sworn members to establish and maintain their residence within the State of Delaware, but it does not provide housing benefits to any of its employees.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

75.    DSP does not offer any housing benefits to any of its employees.  Denied that Lieutenant Michael J. Wysock made the statement Plaintiff alleges.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

Case 1:21-cv-00801-RGA   Document 61   Filed 11/15/23   Page 44 of 58 PageID #: 1634

**B0042**

76.     DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this paragraph.  To the extent a response is deemed necessary the allegations are denied.

77.     DSP does not offer any housing benefits to any of its employees.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

78.     Denied that DSP compensated any EPU Troopers with additional pay for time spent commuting to assignments.  DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.  To the extent a further response is deemed necessary the allegations are denied.

79.     DSP does not offer any housing benefits to any of its employees.  DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

80.     Denied that DSP compensated any EPU Troopers with additional pay for time spent commuting to assignments.  DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the remaining allegations in this paragraph.  To the extent a further response is deemed necessary the allegations are denied.

81.     Denied.

82.     Denied.

83.     Denied.

84.     Denied.

85.     Denied.

86.     Denied.

87.     Denied.

88.     Denied

89.     Denied.

90.     Denied.

91.     Denied.

92.     Denied.

93.     Denied.

94.     Denied.

95.     Denied.

96.     Denied.

97.     Denied.

98.     Denied.

99.     Denied.

100.    Denied.

101.    Denied.

102.    Denied.

103.    Denied.

104.    Denied.

105.    Denied.

106.    Denied.

107.    Denied.

108.    Denied.

109.    Denied.

110.   Denied.

111.   Denied.

112.   Denied.

113.   Denied.

114.   Denied.

115.   Denied.

116.   Denied.

117.   Denied.

118.   Denied.

119.   Plaintiff requested a transfer from the EPU to Troop 4 on October 18, 2015. The remaining allegations in this paragraph are denied.

120.   Denied.

121.   Denied.

122.   Admitted that Plaintiff was assigned to B Shift after Plaintiff requested a transfer from EPU to Troop 4 in October 2015. Denied that the Troop 4 B Shift is the least productive shift. To the extent a further response is deemed necessary, the allegations in this paragraph are denied.

123.   Denied.

124.   Denied.

125.   Denied.

126.   Denied.

127.   Denied.

128.   Denied.

129.   Denied.

130.   Denied.

131.   Denied.

132.   Denied.

133.   Denied.

134.   Denied.

135.   Denied.

136.   Admitted that Lieutenant Michael J. McColgan ("Lieutenant McColgan") has not pushed any Troopers.  To the extent a further response is deemed necessary, the allegations in this paragraph are denied.

137.   Denied.

138.   Denied.

139.   Denied.

140.   Denied.

141.   Denied.

142.   Denied.

143.   Denied.

144.   Denied.

145.   Denied.

146.   Denied.

147.   Denied.

148.   Denied.

149.   Denied.

150.    On November 20, 2017, Plaintiff received a Written Reprimand for just cause when she failed to arrest a suspect for domestic violence on November 6, 2017.   The remaining allegations in this paragraph are denied.

151.    Denied.

152.    Denied.

153.    Denied.

154.    The reorganization of shifts is a normal occurrence at DSP and is based on operational necessity.   In 2017, Captain Rodney Layfield ("Captain Layfield") rearranged several Troopers at Troop 4 and all shifts were affected by the changes.   As a result of the reorganization, Plaintiff received new Troopers to supervise, as did all the other Sergeants at Troop 4.   To the extent a further response is required, the allegations in this paragraph are denied.

155.    In January 2018, Captain Layfield contacted Plaintiff by telephone, while Plaintiff was on vacation, to inform her that she was being transferred to Troop 5.   Denied that DSP has a policy limiting communications between Officers during vacation periods.   To the extent a further response is required, the allegations in this paragraph are denied.

156.    DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.   To the extent a further response is deemed necessary the allegation in this paragraph is denied.

157.    DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.   To the extent a further response is deemed necessary the allegation in this paragraph is denied.

158.    Denied.

159.    Denied.

160.    Denied.

161.    Denied.

162.    On February 9, 2018, DSP received a note from Plaintiff's treating physician Fabricio Alaracon, M.D. ("Dr. Alaracon") that stated, "Nicole Oldam . . . will not be able to return to work until further notice" but did not specify the reason for her inability to work.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

163.    Admitted that Plaintiff provided Captain Layfield and Human Resources with a note from Dr. Alaracon.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

164.    Admitted.

165.    Denied.

166.    Denied.

167.    Denied.

168.    Denied.

169.    Denied.

170.    Denied.

171.    Denied.

172.    Denied.

173.    Denied.

174.    Denied.

175.    Denied.

176.    Denied.

177.    Denied

178.    Denied.

179.    Denied.

180.    Denied.

181.    On October 31, 2018, Colonel Nathaniel McQueen, Jr. informed Plaintiff of DSP's policy to separate employees from DSP when the employee has a medical prognosis indicating there is no reasonable probability the employee will fully recover, and that Plaintiff's current available leave balances allowed for compensation through December 31, 2018.  To the extent a further response is deemed necessary the allegations in this paragraph are denied.

182.    Admitted.

183.    Denied. Plaintiff retired on January 1, 2019.

184.    Denied. Plaintiff retired on January 1, 2019.

185.    Denied.

186.    Denied.

187.    Denied.

188.    Admitted, upon information and belief.

189.    Admitted, upon information and belief.

190.    Admitted, upon information and belief.

IV.    **INJURIES AND DAMAGES**

191.    DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegations regarding Plaintiff's alleged diagnosis in December 2019.  The remaining allegations in this paragraph are denied.

192.    DSP is without knowledge or information sufficient to form a belief as to the truth or falsity of the allegation in this paragraph.  To the extent a further response is deemed necessary the allegation in this paragraph is denied.

193.    Denied.

## V.    OTHER ALLEGATIONS REGARDING DEFENDANT'S CONDUCT

194.    Denied.

## VI.    CLAIMS

### COUNT I
### Hostile Work Environment (Sex – Title VII and DDEA)

195.    DSP incorporates its answers in the previous paragraphs as if fully set forth herein.

196.    Denied.

197.    Denied.

198.    Denied.

199.    Denied.

200.    Denied.

201.    Denied.

### COUNT II
### Involuntary Transfer (Sex – Title VII and DDEA)

202.    DSP incorporates its answers in the previous paragraphs as if fully set forth herein.

203.    Admitte that Plaintiff is a female.  The remaining allegations are denied.

204.    Denied.

205.    Denied.

206.    Denied.

207.   Denied.

## COUNT III
### Involuntary Termination of Employment (Sex – Title VII and DDEA)

208.   DSP incorporates its answers in the previous paragraphs as if fully set forth herein.

209.   Denied.

210.   Admitted that Plaintiff was transferred to Troop 5 on January 29, 2018.   The remaining allegations are denied.

211.   Denied.

212.   Denied.

213.   Denied.

214.   Denied.

215.   Denied.

## COUNT IV
### Involuntary Transfer In Retaliation
### For Opposing Illegal Practices (Sex – Title VII and DDEA)

216.   DSP incorporates its answers in the previous paragraphs as if fully set forth herein.

217.   Denied.

218.   Denied.

219.   Denied.

220.   Denied.

221.   Denied.

## COUNT V
### Involuntary Termination of Employment in Retaliation
### For Opposing Illegal Practices (Sex – Title VII and DDEA)

222.   DSP incorporates its answers in the previous paragraphs as if fully set forth herein.

223.   Denied.

224.    Admitted that Plaintiff was transferred to Troop 5 on January 29, 2018.   The remaining allegations are denied.

225.    Denied.

226.    Denied.

227.    Denied.

228.    Denied.

229.    Denied.

## PRAYER FOR RELIEF[2]

DSP denied Plaintiff's prayers for relief.

## AFFIRMATIVE DEFENSES

A.      Plaintiff's Complaint fails to state any cause of action upon which relief can be granted as a matter of fact and/or law.

B.      Plaintiff's claims are barred, in whole or in part, by their failure to exhaust their administrative remedies and/or failure to file timely charges with the federal Equal Employment Opportunity Commission and/or the Delaware Department of Labor.

C.      Plaintiff's claims are barred, in whole or in part, by their failure to exhaust administrative remedies and/or other applicable federal or state statutes of limitation, jurisdictional and/or administrative requirements.

D.      Plaintiff's claims fail, in whole or in part, because at all times DSP made a good faith effort to comply with applicable law, and acted lawfully and with legitimate, non-

---

[2] Although not a heading in Plaintiff's Complaint, Defendant included this heading in its Answer for ease of the Court.

discriminatory business reasons that were not a pretext for unlawful discrimination, harassment, or retaliation.

E.      Plaintiff's claims are barred, in whole or in part, by her failure to mitigate damages, if any.

F.      Plaintiff waived or is estopped from asserting the allegations set forth in the Complaint.

G.      Plaintiff's damage claims are limited to those provided by statute.

H.      Plaintiff's claims against DSP are barred by the Delaware Tort Claims Act, 10 *Del. C.* § 4001, *et seq.*

I.      Plaintiff's claims are barred, in whole or in part, by applicable federal and state statutes of limitations, jurisdictional, and/or other administrative requirements, including without limitation the Eleventh Amendment to the Constitution of the United States of America and the doctrine of sovereign immunity.

J.      Plaintiff's claims against DSP, in whole or in part, are barred by the doctrine of qualified immunity.

K.      DSP has not knowingly or intentionally waived any applicable defenses and reserves the right to assert and rely on such other applicable defenses as may later become available or apparent through the course of this litigation.  DSP further reserves the right to amend this Answer and/or Affirmative Defenses accordingly.

WHEREFORE, DSP requests that judgment be entered against Plaintiff with prejudice, that DSP be awarded costs and reasonable attorneys' fees, and that the Court order such other and further relief as the Court may deem just and proper in this case.

Dated: June 24, 2022

**STATE OF DELAWARE
DEPARTMENT OF JUSTICE**

*/s/ Victoria R. Sweeney*
Victoria R. Sweeney, ID #6586
Deputy Attorney General
Carvel State Office Building
820 North French Street, 6th Fl.
Wilmington, Delaware 19801
(302) 577-8400
Victoria.Sweeney@delaware.gov
*Attorney for Defendant*



Search This Site
Search This Site
Search ☐
(https://delaware.gov/)

# Delaware State Police

# Troop Locations



**Delaware State Police: Troop 1**

Search This Site

603 Philadelphia Pike
Wilmington, DE 19809
(302) 761-6677 □

(https://delaware.gov/)                    □

**Delaware State Police: Troop 2**

100 Corporal Stephen J Ballard Way
Newark, DE 19702
(302) 834-2620 □

**Delaware State Police: Troop 3**

3759 South State Street
Camden, DE 19934
(302) 697-4454 □

**Delaware State Police: Troop 4**

23652 Shortly Rd
Georgetown, DE 19947
(302) 856-5850 □

**Delaware State Police: Troop 5**

9265 Public Safety Way
Bridgeville, DE 19933
(302) 337-1090 □

**Delaware State Police: Troop 6**

3301 Kirkwood Highway
Wilmington, DE 19808
(302) 633-5000 □

B0056

**Search This Site**

(https://delaware.gov/)

**Delaware State Police: Troop 7**

19444 Mulberry Knoll Road
Lewes, DE 19958
(302) 644-5020

**Delaware State Police: Troop 9**

414 Main Street
Odessa, DE 19730
(302) 378-5749

(https://dsp.delaware.gov/locations/?print=pdf)    Print This Page  (https://dsp.delaware.gov/locations/?print=print)

Related Topics: Locations (https://dsp.delaware.gov/tag/locations/), Troop Locations (https://dsp.delaware.gov/tag/troop-locations/)