**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

NICOLE L. OLDHAM,

        Plaintiff,

    v.

DIVISION OF STATE POLICE,
DEPARTMENT OF SAFETY &
HOMELAND SECURITY, STATE OF
DELAWARE,

        Defendant.

Civil Action No. 21-801-RGA

<u>MEMORANDUM OPINION</u>

John M. LaRosa (argued), LAROSA & ASSOCIATES LLC, Wilmington, DE,

    Attorney for Plaintiff.

Kenneth Lee-Kay Wan, Joseph Clement Handlon, Victoria R. Sweeney (argued), STATE OF
DELAWARE, DEPARTMENT OF JUSTICE, Wilmington, DE,

    Attorneys for Defendant.

May 17, 2024

1



**ANDREWS, U.S. DISTRICT JUDGE:**

Before me is Defendant's Motion for Summary Judgment. (D.I. 51). I have considered the parties' briefing. (D.I. 52, 60, 65). I heard oral argument on February 5, 2024. (Hearing Tr.).[1]

For the reasons set forth below, Defendant's Motion for Summary Judgment is GRANTED.

## I.   BACKGROUND

The instant action arises from a plethora of incidents of harassment and discrimination spanning Plaintiff's career as a Delaware State Police officer from 2002 to 2018.[2]

Plaintiff began her employment with Defendant in 2002. (D.I. 5 ¶ 12). After graduating from the Police Academy in 2003, Plaintiff was assigned to Troop 7 in Lewes. (D.I. 52 at 1–2; D.I. 53 at A0014). While at Troop 7, Plaintiff faced, and reported, multiple incidents of discrimination and harassment, including events involving Trooper Smyk and Sergeant Dean. (D.I. 60 at 3). In 2013, Plaintiff, now a Sergeant, left Troop 7 to join the Governor's Executive Protection Unit ("EPU"). (D.I. 5 ¶¶ 23–25; D.I. 52 at 1–2). Plaintiff encountered, and reported, multiple incidents of discrimination and harassment during her stint in the EPU, including events involving Corporal Rossi and Major Evans. (D.I. 60 at 3).

In 2015, Plaintiff requested a transfer from the EPU, and she was assigned to Troop 4 in Georgetown. (D.I. 52 at 2; D.I. 60 at 3). While at Troop 4, she worked patrol as the supervisor of the B Shift. (D.I. 60 at 2; D.I. 53 at A0014). Plaintiff reported directly to Lieutenant Hake,

---

[1] Citations to the transcript of the argument, which is on file at D.I. 78, are in the format "Hearing Tr. at __."

[2] I state the background based on viewing the evidence in the light most favorable to Plaintiff.

and then to Lieutenant DiSilvestro after Lt. Hake's retirement in 2017. (Hearing Tr. at 6:25–7:24). Both Lieutenants reported directly to Captain Rodney Layfield. (*Id.*). The chain of command then proceeded to one of the four majors,[3] and then to Colonel Nathaniel McQueen, Jr. (*Id.* at 4:21–5:9, 10:15–17).

Plaintiff faced a litany of discriminatory actions during her time at Troop 4. This list includes (1) the understaffing of the shifts led by female supervisors, reported to Captain Layfield in 2015 (D.I. 60 at 4); (2) Sergeant Mitchell spreading false rumors in November 2016 that she was reassigned from the EPU because she slept with male subordinates, and that she continued the do so at Troop 4 (*id.* at 3); and (3) an email sent by Captain Layfield in August 2017, which asked Sergeants to have their Troopers stop by the Sussex Communication Center for Police to meet the dispatchers and joked, "Sgt. Yeager has already bridged that gap," in reference to the female Sergeant's relationship with one of the employees there. (D.I. 62 at B0060; Hearing Tr. at 67:18–68:25).

In October 2017, Lieutenant John McColgan sent Plaintiff "derogatory, belittling emails" and "badmouthed" her to Criminal Investigations. (D.I. 60 at 3–4). After she complained about Lt. McColgan's emails' tone and phrasing at a sergeants' meeting on October 26, 2017, Lt. McColgan forced her, but not Sgt. Mitchell, who also complained about the emails, to stay for a subsequent meeting. (*Id.*; *see* D.I. 53 at A0436–37, 257:11–58:6).

On October 27, 2017, Plaintiff and Lt. McColgan met in his office to discuss warrant attempts. (D.I. 52 at 3; D.I. 60 at 5). The conversation became heated, with Plaintiff accusing Lt. McColgan of treating her harshly because of her rejection of romantic advances made by Lt.

---

[3] Major Sean Moriarty served as the Operation Operations Officer for Kent and Sussex County, which included Troop 4, from April 16, 2017 to July 27, 2020. (D.I. 53 at A1110–11 ¶¶ 1–2).

McColgan's brother.  (D.I. 52 at 3; D.I. 60 at 5).  The interaction ended with Lt. McColgan

pushing Plaintiff in the center of her chest to get her out of his office, making contact with her

breasts in the process.  (D.I. 52 at 4; D.I. 60 at 5).  When Plaintiff complained to Capt. Layfield

about the incident later that day, Capt. Layfield told her she could be guilty of insubordination if

she refused to back off and not to pull "the female card."  (D.I. 60 at 5–6; D.I. 53 at A0709,

305:22–24).  Capt. Layfield explained at his deposition that he felt Plaintiff was acting in a

concerning manner and was not showing the appropriate level of respect to a superior officer.

(D.I. 53 at A0488, 99:3–100:18).  Capt. Layfield met with Plaintiff, Lt. McColgan, and Lt.

DiSilvestro that same day to address the incident.  (D.I. 52 at 4; D.I. 60 at 6).

     During that meeting, Lt. McColgan "visually and verbally harassed" Plaintiff.  (D.I. 60 at

6 (cleaned up)).  Lt. McColgan "leaned back in his chair," "grabbed his crotch," "spread his leg,"

"put his hands behind his back," and "lifted his leg and crossed his leg over."  (D.I. 53 at A0708,

312:4–21).  Lt. McColgan told Plaintiff that "his life [was] so good he can't even give away

enough" and not to flatter herself into thinking that "he's coming into work to try to attack

[her]."  (*Id.* at A0708–09, 313:21–14:2).  Lt. McColgan then announced that he would no longer

have direct communication with her.  (*Id.* at A0394, 88:17–89:4).  After dismissing Lt.

McColgan and Lt. DiSilvestro, Capt. Layfield brought up tragic events from Plaintiff's life,

including her friend's murder, her brother's death on July 4, 2016, and her divorce in 2016, and

suggested she contact the Employee Assistance Program.  (D.I. 60 at 6; D.I. 53 at A0732–33,

407:19–10:6).  The Employee Assistance Program provides counseling services to officers.  (D.I.

53 at A0435, 250:7–17; *id.* at A0492–93, 117:24–18:10).  Plaintiff broke down crying during this

interaction.  (D.I. 60 at 6; D.I. 53 at A0493, 118:14–19:2).

Capt. Layfield proposed a fitness for duty evaluation on November 7, 2017. (D.I. 60 at 7; D.I. 53 at A0504–05, 165:24–66:4). During his deposition, Capt. Layfield explained that he was unsure of what exactly a fitness for duty evaluation entailed and that his proposal was meant to explore whether Plaintiff's supervisors could mandate she seek help from the Employee Assistance Program. (D.I. 53 at A0494–96, 125:9–32:17). Monica Holmes, a member of Defendant's HR department, informed Capt. Layfield that just cause did not exist for a fitness for duty evaluation and that Plaintiff would have to voluntarily reach out to the Employee Assistance Program. (*Id.* at A0496, 131:7–33:5). Capt. Layfield was instead instructed to document any concerning incidents involving Plaintiff, especially those related to work performance. (D.I. 60 at 7; D.I. 53 at A0192). On November 13, 2017, Capt. Layfield asked Lt. DiSilvestro to investigate a November 6, 2017 domestic case that Plaintiff had handled due to concerns with the quality of her work on the case. (D.I. 60 at 7; D.I. 53 at A0394–95, 89:24–90:11; *id.* at A0504, 164:7–65:4). The investigation culminated in an official reprimand on November 20, 2017. (D.I. 60 at 7; D.I. 53 at A0504, 164:16–65:10).

Col. McQueen announced Plaintiff's transfer to Troop 5 in Bridgeville on January 29, 2018. (D.I. 52 at 2; D.I. 60 at 7–8). Defendant maintains this decision was made after the Executive Staff discussed the need to resolve the intrapersonal issues Plaintiff had with Lt. McColgan and Capt. Layfield and concluded this transfer "would create space between Plaintiff and the Troop 4 Administration and afford Plaintiff with an opportunity to start fresh." (D.I. 52 at 5; D.I. 60 at 8). During a phone call informing her about the transfer, Capt. Layfield stated the Troop 5 Administration "was more like her." (D.I. 60 at 8; D.I. 54 at A0727, 387:9–13). Plaintiff infers this comment referred to the fact that the Captain and one of the two Lieutenants at Troop 5 were female. (D.I. 60 at 8 n. 10; D.I. 53 at A0, 387:14–88:11).

The transfer was set to go into effect on March 4, 2018. (D.I. 52 at 2; D.I. 53 at A0209). On February 8, 2018, Plaintiff informed Capt. Layfield that she could not accept the transfer because her brother's 2016 overdose death occurred within the jurisdiction of Troop 5. (D.I. 52 at 5; D.I. 53 at A0210). On February 9, 2018, Plaintiff went on medical leave, providing Capt. Layfield and the HR department with a doctor's note from her primary care provider, Dr. Alaracon. (D.I. 52 at 6; D.I. 53 at A0212). The note included the name of Dr. Alaracon's medical facility, "Atlantic Family Physicians Healthy Outcomes Weight Loss Center," at the top of the page. (D.I. 53 at A0212). When providing Plaintiff's doctor's note to other members of the Troop 4 Administration, Capt. Layfield joked that her doctor's office was not a legitimate medical facility and stated that he thought her doctor was a dietician. (D.I. 60 at 9; D.I. 53 at A0421, 196:7–19; D.I. 53 at A0529, 262:14–63:1). When trying to forward the note to Lt. Colonel Monroe Hudson, Capt. Layfield instead texted the attachment to Plaintiff and wrote, "Yep, diet Doctor." (D.I. 60 at 9; D.I. 53 at A0211).

Plaintiff remained on medical leave until her termination on October 31, 2018. (D.I. 5 ¶ 181; D.I. 52 at 6–7). Several months before her termination, Plaintiff's access to Defendant's email system was removed. (D.I. 60 at 10; D.I. 53 at A0730, 399:14–22). On June 20, 2018, Ms. Holmes of HR sent standardized questionnaires, used by the HR department to receive updates about on-leave employees from medical providers, to Dr. Alaracon and Defendant's mental healthcare provider, Ms. Snyder. (D.I. 53 at A1104 ¶ 16). Ms. Snyder and Dr. Alaracon, on June 27 and July 11, 2018 respectively, returned the questionnaires, stating Plaintiff was not able to perform all the requirements of a full duty officer and that they were not able to give an estimated prognosis for Plaintiff's return to full duty. (*Id.* at A0225–26, A0265–66; *id.* at A1104 ¶¶ 17–18). Dr. Alaracon informed Ms. Holmes that he did not expect any change in Plaintiff's

work status for three months. (*Id.* at A0263). In October 2018, Ms. Holmes contacted Dr.

Alaracon and Ms. Snyder requesting another update. (*Id.* at A1104 ¶ 20). Ms. Snyder and Dr.

Alaracon, on October 24, 2018 and on October 31, 2018 respectively, returned completed

questionnaires indicating that Plaintiff was not capable of performing in a fully duty capacity and

no probability existed for Plaintiff's return to full duty. (*Id.* at A0297, A0301; *id.* at A1104–05

¶¶ 22, 24). Ms. Snyder specified that her diagnosis was based on Plaintiff's "mental health

status," that Plaintiff's "symptoms remain significant," and that a number of requirements of a

full duty officer served as "triggers" for Plaintiff. (D.I. 53 at A0295–96). On October 31, 2018,

Col. McQueen sent Plaintiff a letter notifying her of her termination. (D.I. 53 A0305–06).

Plaintiff's attorney sent a letter on July 5, 2018 to the Secretary of the Delaware

Department of Safety and Homeland Security, raising the legal claims at issue in this case. (D.I.

53 at A0227–44). Plaintiff filed a Charge of Discrimination with the Equal Employment

Opportunity Commission ("EEOC") on October 23, 2018. (D.I. 8-2, Ex. B). The present action

was filed on June 1, 2021. (D.I. 1). The Amended Complaint alleges claims of hostile work

environment (Count I); gender discrimination based on Plaintiff's transfer to Troop 5 (Count II);

gender discrimination based on her termination (Count III); retaliation based on her transfer to

Troop 5 (Count IV); and retaliation based on her termination (Count V). (D.I. 5 § VI). All

claims are raised under both Title VII and the Delaware Discrimination in Employment Act

("DDEA"). *Id.* Defendant moves for summary judgment of all claims. (D.I. 51).

## II.   LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED.

R. CIV. P. 56(a). The moving party has the initial burden of proving the absence of a genuinely

disputed material fact relative to the claims in question. *Celotex Corp. v. Catrett*, 477 U.S. 317, 330 (1986). Material facts are those "that could affect the outcome" of the proceeding. *Lamont v. New Jersey*, 637 F.3d 177, 181 (3d Cir. 2011) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "[A] dispute about a material fact is 'genuine' if the evidence is sufficient to permit a reasonable jury to return a verdict for the nonmoving party." *Id.* The burden on the moving party may be discharged by pointing out to the district court that there is an absence of evidence supporting the non-moving party's case. *Celotex*, 477 U.S. at 323.

The burden then shifts to the non-movant to demonstrate the existence of a genuine issue for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986); *Williams v. Borough of West Chester*, 891 F.2d 458, 460–61 (3d Cir. 1989). A non-moving party asserting that a fact is genuinely disputed must support such an assertion by: "(A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials; or (B) showing that the materials cited [by the opposing party] do not establish the absence . . . of a genuine dispute . . . ." FED. R. CIV. P. 56(c)(1). The non-moving party's evidence "must amount to more than a scintilla, but may amount to less (in the evaluation of the court) than a preponderance." *Williams*, 891 F.2d at 460–61.

When determining whether a genuine issue of material fact exists, the court must view the evidence in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor. *Scott v. Harris*, 550 U.S. 372, 380 (2007); *Wishkin v. Potter*, 476 F.3d 180, 184 (3d Cir. 2007). If the non-moving party fails to make a sufficient showing on an essential element of its case with respect to which it has the burden of proof, the moving party is entitled to judgment as a matter of law. *See Celotex Corp.*, 477 U.S. at 322.

8

## III.   DISCUSSION

### A. Hostile Work Environment

Plaintiff alleges Defendant created a gender-based hostile work environment that spanned her entire career as an officer.

Title VII prohibits sexual harassment that is "sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment." *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 67 (1986). "To succeed on a hostile work environment claim, the plaintiff must establish that 1) the employee suffered intentional discrimination because of his/her sex, 2) the discrimination was severe or pervasive, 3) the discrimination detrimentally affected the plaintiff, 4) the discrimination would detrimentally affect a reasonable person in like circumstances, and 5) the existence of *respondeat superior* liability." *Mandel v. M&Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013). "To determine whether an environment is hostile, a court must consider the totality of the circumstances, including 'the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Id.* at 168 (quoting *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 23 (1993)).

"Hostile environment claims are different in kind from discrete acts." *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002). Discrete acts include "termination, failure to promote, denial of transfer, or refusal to hire." *Id.* at 114. "A hostile work environment claim is composed of a series of separate acts that collectively constitute one unlawful employment practice and cannot be said to occur on any particular day." *Mandel*, 706

9

F.3d at 165 (citing *Morgan*, 536 U.S. at 115–17) (cleaned up); *see* 42 U.S.C. § 2000e–5(e)(1).

"Their very nature involves repeated conduct." *Morgan*, 536 U.S. at 115.

### 1. Continuing Violation Doctrine

Defendant argues that Plaintiff's hostile work environment claim is time-barred.  (D.I. 52

at 8).  Plaintiff's claim covers events ranging from her time at Troop 7 in 2002 up until her

termination in 2018.  (*See* D.I. 60 at 13–14).[4]  "A claimant bringing a charge of discrimination

under Title VII in Delaware has 300 days from the time of the alleged discriminatory act to file a

complaint with the EEOC."  *Riley v. Delaware River & Bay Auth.*, 457 F. Supp. 2d 505, 510 (D.

Del. 2006); *see also Morgan*, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionable

if time barred, even when they are related to acts alleged in timely filed charges.").  Plaintiff filed

her EEOC charge on October 23, 2018.  Therefore, in the usual case, only acts on or after

December 27, 2017 would be considered as part of Plaintiff's hostile work environment claim.

Plaintiff nevertheless argues that the events outside the 300-day window are a part of the hostile

work environment claim based on the continuing violation doctrine.[5]  (D.I. 60 at 13–14).

---

[4] At oral argument, Plaintiff agreed that the events alleged in her complaint that occurred before
Colonel McQueen became the Colonel, which are in about 2012 to 2013, are not "actionable."
(Hearing Tr. at 56:2–57:5).

[5] Defendant argues that discrete acts, such as Plaintiff's transfer and termination, cannot be a part
of the continuing violation doctrine analysis.  (D.I. 65 at 4 n. 8 (citing *Kemske v. Johnson
Controls, Inc.*, 52 F. Supp. 3d 688, 697 (D. Del. 2014))).  As I noted in my opinion denying
Defendant's motion to dismiss, I do not think Third Circuit case law provides a definitive ruling
on the matter.  *See Hantz v. Div. of State Police, Dep't of Safety & Homeland Sec.*, 2022 WL
1523064, at *3 & n. 1 (D. Del. May 13, 2022); *see also Mudie v. Philadelphia Coll. of
Osteopathic Med.*, 2022 WL 1607544, at *12 (E.D. Pa. May 20, 2022) ("Other courts in this
Circuit have held that timely discrete acts can render non-discrete acts timely under the
continuing violation doctrine."), *aff'd*, 2023 WL 6210754 (3d Cir. Sept. 25, 2023).  As I
otherwise find that Plaintiff cannot use the continuing violation doctrine to save her claim, I need
not decide this issue.

"Under the continuing violation doctrine, discriminatory acts that are not individually actionable may be aggregated to make out a hostile work environment claim; such acts 'can occur at any time so long as they are linked in a pattern of actions which continues into the applicable limitations period.'" *Mandel*, 706 F.3d at 165 (quoting *O'Connor v. City of Newark*, 440 F.3d 125, 127 (3d Cir.2006))). "To allege a continuing violation, the plaintiff must show that all acts which constitute the claim are part of the same unlawful employment practice and that at least one act falls within the applicable limitations period." *Mandel*, 706 F.3d at 165–66 (citing *Morgan*, 536 U.S. at 122; *West v. Phila. Elec. Co.*, 45 F.3d 744, 754–55 (3d Cir. 1995)). Alleged acts are part of the same unlawful employment practice when they involve "similar conduct by the same individuals, suggesting a persistent, ongoing pattern." *Doe v. Mercy Cath. Med. Ctr.*, 850 F.3d 545, 566 (3d Cir. 2017). "The reach of [the continuing violation] doctrine is understandably narrow." *Tearpock-Martini v. Borough of Shickshinny*, 756 F.3d 232, 236 (3d Cir. 2014).

Defendant argues the alleged events, spanning Plaintiff's entire career as an officer, do not qualify as one "unlawful employment practice." (D.I. 52 at 8–10). Though Plaintiff contends that all alleged acts were part of a "persistent ongoing pattern of sex discrimination," she does not provide any explanation to support this broad, conclusory assertion. (D.I. 60 at 14). I agree with Defendant that Plaintiff's "everything-but-the-kitchen-sink" list of allegations does not represent "similar conduct by the same individuals." *Mudie v. Philadelphia Coll. of Osteopathic Med.*, 2022 WL 1607544, at *14 (E.D. Pa. May 20, 2022), *aff'd*, 2023 WL 6210754 (3d Cir. Sept. 25, 2023).

At oral argument, Plaintiff's attorney identified Capt. Layfield and Col. McQueen as the perpetrators of the pattern of sex discrimination. (Hearing Tr. at 62:26–63:5). The claimed

11

pattern began with Plaintiff's report of Cpl. Rossi's sexual harassment to Col. McQueen during her time at the EPU. (*Id.* at 58:23–59:3; *see* D.I. 60 at 4). Plaintiff left the EPU in about October 2015. (D.I. 60 at 3). Plaintiff's attorney conceded Col. McQueen was not involved in any other events until Plaintiff's transfer and termination. (Hearing Tr. at 63:6–9). The transfer occurred at the beginning of 2018. Nevertheless, Plaintiff's attorney argued that during the more than two-year gap, Capt. Layfield "picks up the baton" with Plaintiff's tenure at Troop 4. (*Id.* at 63:10–13). In particular, he pointed to Capt. Layfield's alleged understaffing of female-led shifts at Troop 4. (Hearing Tr. at 64:3–65:12; D.I. 60 at 4). This understaffing was allegedly part of a "theme[]" of "unequal workloads" that continued from her time in the Collision Reconstruction Unit at Troop 7 where she claims she had an unequal amount of death notifications under Sgt. Dean. (Hearing Tr. at 66:10–25; *see* D.I. 60 at 3). Plaintiff's attorney also pointed to Capt. Layfield's email making a "shot" at another female Sergeant, his inaction with regards to Sgt. Michell's false rumors, and his involvement in the October 2017 events revolving around Lt. McColgan. (Hearing Tr. at 67:14–72:5).

As an initial matter, I note that Plaintiff's briefing could be more helpful. The argument section of Plaintiff's brief does not really marshal an argument. Instead, it points to the Statement of Facts section, which describes facts over a sixteen-year period, and broadly alleges an "ongoing pattern of sex discrimination" since 2002 with no additional explanation. (D.I. 60 at 13–14). The theories and arguments Plaintiff's counsel raised at oral argument do not save Plaintiff's claim.

The continuing violation approach fails because there is no similar conduct by the same individuals. For example, as Plaintiff concedes, Col. McQueen was not involved in any of the

events between Plaintiff's time at the EPU and her transfer to Troop 5.[6] (Hearing Tr. at 63:6–9).
I reject Plaintiff's position, that the same participants were involved because different officers
"passed the baton" to each other, as it would render the "same individuals" requirement
meaningless. Plaintiff does not show or explain how all these events, or even the events taking
place during her time at Troop 4, amount to "more than the occurrence of isolated or sporadic
acts of intentional discrimination." *West*, 45 F.3d at 754–55. Even assuming Capt. Layfield's
involvement in all the events that occurred at Troop 4 satisfies the "same individuals"
requirement, itself a doubtful proposition given Capt. Layfield's "participation" in some of the
events was nothing more than awareness, the harassment at Troop 4 ranged from unequal
workloads[7] to false rumors to physical harassment to discriminatory transfer. It is especially
clear that Plaintiff's grab bag of events does not constitute "similar conduct" when considering
that the only events that occurred within the 300-day window were Capt. Layfield's February 9,
2018 text message, Plaintiff's transfer, her loss of email access, and her termination.[8]
Furthermore, Capt. Layfield was not involved in Plaintiff's losing email access or in the
termination decision.

---

[6] Only one event during Plaintiff's stint at the EPU involved Col. McQueen. (D.I. 60 at 3, #6).
In 2013, Plaintiff's subordinate made unwanted and aggressive sexual advances towards
Plaintiff, and Col. McQueen, then her direct supervisor, did nothing when Plaintiff reported the
incident. That was about two years before Plaintiff transferred to Troop 4 and Capt. Layfield
came into the picture.

[7] I do not think any reasonable jury could find the workload complaint to be viable. There were
four patrol shifts at Troop 4. Shifts C and D had ten officers while shifts A and B had nine. (D.I.
62 at B0059; D.I. 53 at A0690, 238:4–12). When Plaintiff moved to Troop 4, she took over
leadership of shift B. (D.I. 53 at A0690, 240:11–41:2).

[8] Plaintiff's brief does not identify understaffing as one of the "Discrete & Non-discrete Acts of
Discrimination Less than 300 Days Before [EEOC] Charge." (*See* D.I. 60 at 4, 7–10). Thus,
Plaintiff is not asserting that the understaffing continued into the 300-day window.

While never argued by Plaintiff, the events closest to forming a narrow, actionable pattern are the events of October 27, 2017 and Plaintiff's transfer to Troop 5 in January 2018. While there is certainly a causal connection between the October 27 events, which created tension between Plaintiff and Lt. McColgan and Capt. Layfield, and Plaintiff's transfer to Troop 5, a decision made to help resolve the tension, this pattern still does not involve "similar conduct by the same individuals." Though Capt. Layfield was involved in some of the October 27 events, Col. McQueen, who undisputedly made the final decision on the transfer after input from the Executive Staff, was not. (Hearing Tr. at 10:6–17; D.I. 60 at 6–10). Similarly, while Capt. Layfield proposed the transfer decision, Plaintiff does not contend that Lt. McColgan played a role in the transfer decision. (D.I. 60 at 8). Furthermore, Plaintiff's transfer does not qualify as "similar conduct" to the forced meetings, harassing comments, and physical contact alleged to have occurred on October 27, 2017.

For the reasons above, no reasonable factfinder could find that Plaintiff's hostile work environment claim successful to the extent it relies upon the continuing violation doctrine. Accordingly, Plaintiff's hostile work environment claim, to the extent that it is based on events outside the 300-day window, is time-barred.

I next analyze Plaintiff's prima facie case based on the events within the 300-day window.

### 2.  Prima Facie Case

Defendant contends that Plaintiff failed to establish her prima facie case of hostile work environment based on gender discrimination. In particular, Defendant argues Plaintiff has not demonstrated (1) that discrimination was intentional, (2) that any such discrimination was severe and pervasive, and (3) the existence of *respondeat superior* liability. (D.I. 52 at 10–16).

Plaintiff describes four alleged discriminatory actions that occurred on or after December 27, 2017: (1) Plaintiff's transfer from Troop 4 to Troop 5, announced on January 29, 2018; (2) Capt. Layfield's text message on February 9, 2018; (3) termination of Plaintiff's email access some point after she went on leave on February 9, 2018 but before she was terminated; and (4) Plaintiff's termination on October 31, 2018.[9] (D.I. 60 at 7–10). Plaintiff ties her transfer to gender discrimination based on Capt. Layfield's comment that the Troop 5 Administration "was more like her." (*Id.* at 8 & n. 10). Plaintiff, however, fails to provide any explanation connecting Capt. Layfield's text message, the termination of Plaintiff's email access, or her ultimate termination to gender discrimination. The "standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998)). "Title VII does not prohibit all verbal or physical harassment in the workplace; it is directed only at "discriminat[ion] ... because of ... sex." *Oncale*, 523 U.S. at 80. I therefore focus my analysis of Plaintiff's claim for hostile work environment based on gender discrimination on Plaintiff's transfer to Troop 5. In doing so, I

---

[9] Plaintiff also claims Defendant constructively discharged Plaintiff within the 300-day window. (D.I. 60 at 8). As discussed below, Plaintiff does not have a viable constructive discharge claim. *See infra* Section III.B.2.c. Furthermore, several district courts in the Third Circuit have recently reiterated that constructive discharge is not a standalone claim. *See Doe v. New Castle County,* 2023 WL 7921367, at *2 (D. Del. Nov. 16, 2023) (citing two other district courts)*, app. pending,* No. 23-3190 (3d Cir.). Plaintiff bases her constructive discharge claim on a grouping of three separate events, some of which fall outside the 300-day window. (D.I. 60 at 8–9). Plaintiff's claim therefore belongs to the "subset of constructive discharge claims . . . resulting from sexual harassment, or 'hostile work environment,' attributable to a supervisor." *Pennsylvania State Police v. Suders*, 542 U.S. 129, 130 (2004). Plaintiff's constructive discharge claim cannot be part and parcel of the hostile work environment claim upon which it relies.

find that Plaintiff has not satisfied her burden of showing that her gender discrimination was severe and pervasive.

The transfer, a discrete act that also serves as a basis for Plaintiff's standalone gender discrimination and retaliation claims, is not the type of "repeated conduct" that generally supports a hostile work environment claim by itself. *Morgan*, 536 U.S. at 115. "Hostile environment claims are different in kind from discrete acts." *Id.*; *see also Mercy Cath. Med. Ctr.*, 850 F.3d at 566 ("[Defendant's] decision to dismiss [Plaintiff] was a discrete act actionable on its own as retaliation or *quid pro quo* harassment. It cannot simultaneously support a hostile environment claim."). While the dichotomy described by the *Morgan* court suggests that a discrete act alone cannot give rise to a hostile work environment claim, I am mindful that "one severe incident may be enough to create a hostile work environment." *Komis v. Sec'y of United States Dep't of Lab.*, 918 F.3d 289, 293–94 (3d Cir. 2019). No reasonable jury, however, could find the transfer severe enough to create a hostile work environment based on gender discrimination. As discussed in greater detail below, Plaintiff's transfer resulted in a trivial increase in commuting time and did not significantly, if at all, impact her job responsibilities or future career prospects. *See infra* Section III.B.1. In considering the "totality of the circumstances," the transfer's effect was to separate Plaintiff from the Troop 4 Administration; the transfer, in other words, distanced Plaintiff from the officers she identified as responsible for the sexual harassment and gender discrimination she faced.[10]

---

[10] I note that Plaintiff had gone on medical leave prior to Capt. Layfield's text message, her removal from the email system, and her termination. To the extent these events were considered as part of the hostile work environment analysis, no reasonable factfinder could find these incidents resulted in sexual harassment "sufficiently severe or pervasive to alter the conditions of [Plaintiff's] employment and create an abusive working environment" as Plaintiff was already on leave and no longer exposed to Defendant's work environment. *Vinson,* 477 U.S. at 67.

Plaintiff fails to demonstrate she was subjected to discrimination that was "severe and pervasive," and therefore fails to establish a prima facie case of hostile work environment based on gender discrimination.  My conclusion would remain the same even if I had found Plaintiff could rely on the October 27, 2017 events under the continuing violation doctrine.  The October 27 events include a few more incidents of sexual harassment: Capt. Layfield telling Plaintiff not to pull "the female card," Lt. McColgan pushing Plaintiff in the chest after she accused him of treating her more harshly after she rejected his brother, and Lt. McColgan's actions and comments towards Plaintiff during their meeting with Capt. Layfield and Lt. DiSilvestro.  Even when considering these incidents, a reasonable factfinder still would not find Plaintiff was subjected to "severe and pervasive" sexual harassment.  Plaintiff's position is further undermined by the weakness of her assertion that Lt. McColgan's act of pushing her was discriminatory.  Plaintiff asserts that Lt. McColgan "has not pushed any male Sergeants." (D.I. 60 at 5).  While Plaintiff's argument invokes comparators as its basis for claiming gender discrimination, she relies on Defendant's Answer to the Amended Complaint which states that Lt. McColgan "has not pushed any Troopers" without providing any qualifications regarding gender.  (*Id.* (citing D.I. 15 ¶ 136)).  Considering the statement Plaintiff relies on reflects that Lt. McColgan had only pushed any sergeant once, rather than that Lt. McColgan previously pushed other female sergeants, the inference of discrimination is weak.  Furthermore, the record still reflects the transfer's effect of creating space between Plaintiff and the Troop 4 Administration.

I need not address Defendant's alternative arguments.

### B.  Discrimination

Plaintiff claims that Defendant discriminated against her based on gender when it transferred her from Troop 4 to Troop 5 and when it terminated her employment.

17

The *McDonnell Douglas* burden-shifting framework governs analysis of Title VII discrimination and retaliation claims. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–05 (1973). Plaintiff must first establish a prima facie case of the complained-of discrimination. *Id.* at 802.

To state a prima facie claim for sex discrimination under Title VII, Plaintiff must allege: "(1) [she] is a member of a protected class; (2) [she] was qualified for the position [she] sought to attain or retain; (3) [she] suffered an adverse employment action; and (4) the action occurred under circumstances that could give rise to an inference of intentional discrimination." *Makky v. Chertoff*, 541 F.3d 205, 214 (3d Cir. 2008).

Once a prima facie case has been established, the burden shifts to Defendant to articulate a legitimate non-discriminatory reason for the challenged employment action. *McDonnell Douglas*, 411 U.S. at 802–03. After Defendant proffers a reason for the action, the burden shifts back to Plaintiff to establish that Defendant's articulated rationale is pretext. *Id.* at 804. To avoid summary judgment when Defendant has offered a legitimate reason for its employment action, Plaintiff "must submit evidence which: 1) casts sufficient doubt upon each of the legitimate reasons proffered by the defendant so that a factfinder could reasonably conclude that each reason was a fabrication; or 2) allows the factfinder to infer that discrimination was more likely than not a motivating or determinative cause of the adverse employment action." *Fuentes v. Perskie*, 32 F.3d 759, 762 (3d Cir. 1994).

### 1. Transfer to Troop 5

Defendant maintains that Plaintiff fails to establish a prima facie case of gender discrimination based on her transfer to Troop 5 because the transfer was not an adverse action. (D.I. 52 at 17–20). Plaintiff responds by arguing that "appointment to an undesirable police

18

assignment is sufficient to withstand summary judgment on a retaliation claim." (D.I. 60 at 19

(citing *Mondzelewski v. Pathmark Stores, Inc.*, 162 F.3d 778, 788 (3d Cir. 1998); *Hampton v.

Borough of Tinton Falls Police Dep't*, 98 F.3d 107, 116 (3d Cir. 1996))).  Plaintiff asserts that

she "regarded her reassignment from Super Troop 4 to Troop 5 [as] less desirable," and, "[t]hus,

Plaintiff established an adverse action in her discriminatory transfer claim." (D.I. 60 at 16 (citing

*Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 411–12 (3d Cir. 1999))).

Plaintiff mischaracterizes the law under Title VII.  Whether Plaintiff's transfer qualifies

as an adverse action does not turn on her personal judgment of desirability.  An "adverse

employment action" under Title VII is "an action by an employer that is 'serious and tangible

enough to alter an employee's compensation, terms, conditions, or privileges of employment.'"

*Storey v. Burns Int'l Sec. Servs.*, 390 F.3d 760, 764 (3d Cir. 2004) (quoting *Cardenas v. Massey*,

269 F.3d 251, 263 (3d Cir. 2001)).  Such an action must constitute "a significant change in

employment status, such as hiring, firing, failing to promote, reassignment with significantly

different responsibilities, or a decision causing a significant change in benefits." *Burlington

Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).  "[I]n order to amount to a materially adverse

employment action," the consequences of a transfer "must not arise from the employee's

individual preferences" and "must be 'job-related' in the appropriate sense." *Fallon v. Meissner*,

66 F. App'x 348, 352 (3d Cir. 2003) (citing *Brown v. Brody*, 199 F.3d 446, 457 (3d Cir. 1999);

*Dilenno v. Goodwill Inds.*, 162 F.3d 235, 236 (3d Cir.1998)).  Plaintiff's cited cases accord with

these requirements. *See Jones*, 198 F.3d at 411–12 (recognizing Plaintiff's transfer forced him to

teach a class on a different subject); *Mondzelewski*, 162 F.3d at 788 (recognizing Plaintiff's

transfer altered his work schedule); *Hampton*, 98 F.3d at 116 (recognizing that, while Plaintiff

was not demoted in rank, he was removed from the detective bureau and reassigned to working road patrol))).  Plaintiff's arguments do not succeed under this objective standard.

First, Plaintiff argues her transfer was undesirable because of the location of her brother's death in 2016.  (D.I. 52 at 5).  While I do not doubt that her brother's death affected her deeply, Plaintiff's feeling "very upset" at the thought of working at Troop 5 because of her brother's death somewhere within the jurisdiction is not a job-related objection.  (D.I. 60 at 9).  Plaintiff has not provided any evidence that allows a reasonable factfinder to infer that her brother's death a year and a half earlier affects her ability to work at Troop 5.  *See Dilenno*, 162 F.3d at 236 ("An inability to do a particular job is job-related, unlike a desire to live in a certain city.").

Second, Plaintiff points out the transfer would increase her commute to work from 15.9 miles and 24 minutes to Troop 4 to 22.9 miles and 32 minutes to Troop 5.  (D.I. 60 at 8–9, 9 n. 13).  This eight-minute increase in travel time, however, does not amount to more than a "trivial inconvenience."  *Est. of Oliva ex rel. McHugh v. New Jersey*, 604 F.3d 788, 799 (3d Cir. 2010) (agreeing that a 4.25-mile increase in commute caused "only a trivial harm").

Third, Plaintiff maintains that the transfer changed her job responsibilities.  (D.I. 60 at 8).  She asserts Troop 4 is a "super troop" housing the Governor's Task Force, criminal and drug investigations, and other specialized units.  (*Id.* at 8 & n. 11).  In contrast, Troop 5 is strictly a patrol troop.  (*Id.* at 8).  Plaintiff does not dispute that she worked patrol at Troop 4 and would be similarly assigned at Troop 5.  Plaintiff's counsel instead insists that Plaintiff faced different responsibilities based on the change in jurisdiction and because she would not "have the support of a super troop of the special units, [and] the detective units."  (Hearing Tr. at 81:12–22). Plaintiff's counsel provided no further explanation of how Plaintiff's job responsibilities, as a patrol shift supervisor, would change simply based on being stationed at a new location or based

on having the "support" of a troop without specialized non-patrol units.  No reasonable factfinder would conclude that Plaintiff's transfer amounted to "reassignment with significantly different responsibilities."  *Ellerth*, 524 U.S. at 761.

Fourth, Plaintiff argues that reassignment to Troop 5 decreased her promotion prospects due to the loss of opportunities to get into a special unit at Troop 4.  (Hearing Tr. at 75:6–76:2).  Plaintiff, however, lacked a college degree, a requirement for promotion above Sergeant, and therefore could not advance to the next rank.  (Hearing Tr. at 96:16–20, 97:5–7; D.I. 53 at A0632, 9:22–10:5; *id.* at A0717, 348:19–22).

Plaintiff has not raised a genuine dispute as to material fact with regard to whether the transfer from Troop 4 to Troop 5 is an adverse employment action.  Plaintiff therefore fails to establish a prima facie case of discrimination based on her transfer.

### 2.  Termination

Defendant does not dispute that Plaintiff satisfied her burden of raising a prima facie case of gender discrimination based on her termination on October 31, 2018.  Defendant instead argues Plaintiff failed to rebut its legitimate, non-discriminatory reason for her discharge.  (D.I. 52 at 18).

Defendant contends that Plaintiff's termination was mandated by Defendant's Disability Policy § 2E.  (*Id.* at 7, 18).  This section states, "If, at any time, medical documentation establishes that an employee has an illness or injury that permanently prevents the employee from performing some or all of essential functions of full-duty status, the employee shall be separated from the division."  (D.I. 53 at A0154).  Defendant notes that, in October 2018, Plaintiff's primary medical provider and mental health provider both indicated, for the first time, that "the probability for [Plaintiff] to return to fully duty did not exist."  (D.I. 52 at 18; D.I. 53 at

21

A0297, A0301). Plaintiff's termination letter was sent shortly after Defendant's HR department

received Plaintiff's primary doctor's response. The letter stated, in relevant part:

> It is the policy of the Delaware State Police to accommodate injured or ill
> employees for periods of rehabilitation. This policy provides an employee the
> opportunity, if medically indicated, to return to the workforce in a modified-duty
> position for a one-year period during rehabilitation. This may be extended at six-
> month intervals at my discretion; not to exceed beyond 24 months from the date of
> the illness or injury. If at any time upon discovery of a prognosis that there is no
> reasonable probability that an employee will fully recover; an employee shall be
> separated from the Division.

> On February 9, 2018, you were granted sick leave under the guidelines of the
> Family Medical Leave Act (FMLA) as a result of documentation provided by your
> physician, Dr. Alaracon, which indicated that you were unable to return to work
> "until further notice."

> On October 21, 2018, the Division received documentation from your primary care
> physician, Dr. Alaracon, stating that a prognosis for your return to full-duty was
> non-existent. On October 31, 2018, the Division received documentation from your
> mental health provider, Katherine Snyder, also stating that a prognosis for your
> return to full-duty was non-existent.

> Since we cannot permanently accommodate your situation based on this prognosis,
> policy mandates that you be separated from the Division.

(D.I. 53 at A0305).[11]

Plaintiff challenges Defendant's reliance on § 2E as pretext. (D.I. 60 at 10–13, 18). To

survive summary judgment, Plaintiff is required either:

> (i) to present sufficient evidence to meaningfully throw into question, i.e., to cast
> substantial doubt upon, [Defendant's] proffered reasons for not hiring him (e.g., by
> painting them as weak, implausible, contradictory, or incoherent), or (ii) to come
> forward with sufficient evidence from which a factfinder could reasonably
> conclude that an illegitimate factor more likely than not was a motivating or
> determinative cause of the adverse employment decision (e.g., by showing that the
> employer in the past had subjected him to unlawful discriminatory treatment, that
> the employer treated other, similarly situated persons not of his protected class more
> favorably, or that the employer has discriminated against other members of his
> protected class or other protected categories of persons).

---

[11] The third quoted paragraph incorrectly reverses the dates of the two sets of documentation.
The error is immaterial.

*Fuentes*, 32 F.3d at 765.

Plaintiff contends she has established Defendant's legitimate, non-discriminatory reason was pretext under both *Fuentes* prongs.

### a.  First Method of Proving Pretext

Plaintiff argues that a factfinder could reasonably conclude that Defendant's proffered reason is pretext. (D.I. 60 at 18).  To discredit Defendant's non-discriminatory reason, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Fuentes*, 32 F.3d at 765.

The relevant Argument section of Plaintiff's brief provides no explanation of her position aside from asserting that she "can meet her ultimate burden" and citing to a wide range of sections from the Statement of Facts portion of her brief. (*See* D.I. 60 at 18 (referencing D.I. 60 §§ Statement of Facts.IV–VII.C)).  Plaintiff does not dispute that Col. McQueen was the person responsible for the termination decision and does not argue that Capt. Layfield, Lt. McColgan, or other individuals were involved in this adverse employment action. (Hearing Tr. at 10:6–17; *see id.* at 25:13–18, 82:21–83:5).  I therefore focus my analysis on the factual allegations pertinent to Col. McQueen's decision to terminate Plaintiff. *See Fuentes*, 32 F.3d at 766 ("[S]ince [the Chairman's Executive Assistant], not the staff members, was the relevant decisionmaker, the question is whether Papp believed those criticisms to be accurate and actually relied upon them, since only if [Plaintiff] can ultimately prove that [the Executive Assistant] in fact did not rely upon them can [Plaintiff] show 'pretext.'").

23

Plaintiff does not dispute that Disability Policy § 2E mandates termination of employees

who meet its conditions.  Plaintiff instead maintains that Col. McQueen's decision was not based

on § 2E, but on one of the other sections of the Disability Policy that granted Col. McQueen

discretion to grant Plaintiff additional leave.  (D.I. 60 at 10; Hearing Tr. at 82:21–87:13, 88:5–

92:23).  Plaintiff's brief points to Defendant's Disability Policy §§ 1F, 2C, and 4E as possible

candidates.  (D.I. 60 at 10; Hearing Tr. at 92:6–9).  These sections state:

> [§ 1]F.  In the event that a period of 1 calendar year has occurred from the date of
> absence due to a compensable illness or injury to the expiration of all available
> leave, the Superintendent may authorize an unpaid leave of absence to provide a
> minimum of a 1 year rehabilitation period prior to separation from the Division.
> The Superintendent, when he believes it to be in the best interest of the Division,
> may approve subsequent leaves of absence of up to 6 month intervals, however, in
> no case may the total absence, paid, or unpaid, exceed 2 years from the initial date
> that compensation began.
> . . . .
> [§ 2]C.  In the event that a period of 1 calendar year has not occurred from the date
> of the original absence due to illness or injury to the expirations of all available
> leave of absence to provide a minimum of a 1 year rehabilitation period prior to
> separation from the Division[, the] Superintendent, when he believes it to be in the
> best interest of the Division, may approve subsequent leaves of absence of up to 6
> month intervals, however, in no case may the total absence, paid or unpaid, exceed
> 2 years from the initial date of absence due to the injury or absence.
> . . . .
> [§ 4]E.  A temporary impairment which continues beyond a period of 1 year from
> the date of the original absence or the date that the employee was unable to perform
> all required job functions shall be deemed a permanent disability and the policies
> contained herein shall apply. No pyramidical application of benefits between is
> implied or will be allowed.

(D.53 at A0153–54, A0159).

At oral argument, Plaintiff's attorney recited a number of perceived weaknesses with Col.

McQueen's proffered reason.  He argued that, even though Col. McQueen's letter states that

policy "mandates" separation, the letter does not cite to a specific provision of the Disability

Policy.  (Hearing Tr. at 89:11–22 (referencing D.I. 53 at A0305)).  He argued that Col.

McQueen's usage of the phrase "discovery of prognosis" demonstrates that the "standard" he

used in making his decision was not based on medical documentation. (Hearing Tr. at 89:23–90:2 (referencing D.I. 53 at A0305)). He argued that Col. McQueen's usage of the phrase "no reasonable probability that an employee will fully recover" rather than "permanently prevents" demonstrates that he did not make his decision based on § 2E. (Hearing Tr. at 90:3-7). He argued that the standardized state questionnaire form filled out by the doctor and mental healthcare provider did not qualify as "medical documentation." (Hearing Tr. at 90:8–91:6). He argued the questionnaire form did not include the specific phrase "permanent disability," and therefore Defendant's policy did not permit Col. McQueen to deem Plaintiff permanently disabled based on the medical providers' responses. (Hearing Tr. at 91:7–92:5). He argued that Col. McQueen's deposition testimony, stating that he had discretion to approve subsequent leave for employees falling under Defendant's Disability Policy § 2C, demonstrated his reliance on his discretion in terminating Plaintiff. (Hearing Tr. at 92:6–14; *see* D.I. 53 at A0829, 210:16–13:21).

Plaintiff's counsel's criticisms fall short of the "weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions" needed to disprove Defendant's version of events. *Fuentes*, 32 F.3d at 765. The language used in the termination letter and in the standardized questionnaire indicate the termination decision was made based on the professional opinions of Plaintiff's doctor and healthcare provider. Col. McQueen's use of the phrase "discovery of prognosis," to indicate receipt of the questionnaires, and the phrase "no reasonable probability that an employee will fully recover," to indicate the prognosis that Plaintiff would never be able to resume full-duty responsibilities, paraphrase § 2E. Col. McQueen's letter did not need to cite directly to § 2E or quote its language verbatim.

The questionnaire similarly does not need to recite the relevant policy section word-for-word. Plaintiff's medical providers indicated that Plaintiff was "not capable of performing in a full duty capacity" and that there was no "probability . . . for a return to full duty." The form's questions reflect the conditions that trigger § 2E. I do not accept Plaintiff's argument that the completed questionnaires do not qualify as "medical documentation." The questionnaires serve the purpose of conveying the opinions of Plaintiff's doctor and mental health provider regarding Plaintiff's prognosis; in other words, they serve as documentation of Plaintiff's medical status by medical professionals. Col. McQueen was justified in his reliance on these documents in determining that Plaintiff suffered a "permanent disability."

Col. McQueen's discretion to approve leave under other sections of the Disability Policy likewise does not support Plaintiff's proposition that Col. McQueen had such discretion under § 2E.

Plaintiff "has not succeeded in throwing enough doubt on [Defendant's proffered] explanation[] so that a rational factfinder could reject it." *Fuentes*, 32 F.3d at 766.

### b. Second Method of Proving Pretext

Plaintiff argues a "factfinder could reasonably conclude that discrimination was the more likely cause of [her] discharge." *Id.* at 767. To succeed under the second prong of *Fuentes*, Plaintiff must:

> come forward with sufficient evidence from which a factfinder could reasonably conclude that an illegitimate factor more likely than not was a motivating or determinative cause of the adverse employment decision (e.g., by showing that the employer in the past had subjected him to unlawful discriminatory treatment, that the employer treated other, similarly situated persons not of his protected class more favorably, or that the employer has discriminated against other members of his protected class or other protected categories of persons).

*Id.* at 765.

Plaintiff argues that Col. McQueen allowed some male employees to stay on medical leave for over a year and return. (D.I. 60 at 10–11). Even assuming these individuals qualified as comparable employees to others on temporary leave under Disability Policy § 4E, they are not "similarly situated persons" to employees who fall under § 2E.[12] *Fuentes*, 32 F.3d at 765. Plaintiff, for example, does not point to evidence suggesting any of these personnel had medical documentation stating they "ha[d] an illness or injury that permanently prevent[ed] the employee from performing some or all of essential functions of full-duty status." (D.I. 53 at A0154).

Plaintiff states that, after her termination, Col. McQueen promoted two men to Sergeant, with one newly promoted Sergeant replacing her as Troop 4's B shift supervisor. (D.I. 60 at 12–13). While Plaintiff points out that no women were similarly promoted, any inference of gender discrimination is weakened by the size of the claimed comparator pool. Plaintiff does not identify any other evidence that suggests Col. McQueen's decision was based on discrimination, as opposed to a reliance on Disability Policy § 2E.

No rational factfinder could conclude that gender discrimination played a motivating or determinative factor in Col. McQueen's decision to terminate Plaintiff. For the foregoing reasons, I find Plaintiff has failed to rebut Defendant's legitimate reason for her termination.

### c.  Constructive Discharge Claim

In addition to Plaintiff's discrimination based on actual termination, Plaintiff argues that she faced discriminatory termination when "she was constructively discharged when forced on leave." (D.I. 60 at 18).

---

[12] The record contains minimal information regarding the medical reasons and the lengths of time that these officers were on leave. (*See* D.I. 60 at 11 n. 17). This lack of information makes these individuals questionable comparators even for employees on temporary medical leave.

"The constructive-discharge doctrine contemplates a situation in which an employer discriminates against an employee to the point such that his 'working conditions become so intolerable that a reasonable person in the employee's position would have felt compelled to resign.'" *Green v. Brennan*, 578 U.S. 547, 555 (2016) (quoting *Pennsylvania State Police v. Suders*, 542 U.S. 129, 141 (2004)). "When the employee resigns in the face of such circumstances, Title VII treats that resignation as tantamount to an actual discharge." *Id.* A successful constructive discharge claim requires that a plaintiff (1) "prove first that [she] was discriminated against by [her] employer to the point where a reasonable person in [her] position would have felt compelled to resign," and (2) "show that [she] actually resigned." *Id.*

Plaintiff's claim that she was forced on medical leave does not satisfy the resignation requirement. *See id.* ("[A]n employee cannot bring a constructive-discharge claim unless [she] is constructively *discharged*."). It is further undisputed that Plaintiff did not voluntarily resign from her position and was actually discharged pursuant to Col. McQueen's October 31, 2018 letter. Plaintiff's constructive discharge claim therefore fails as a matter of law.[13]

## C. Retaliation

Plaintiff contends her transfer to Troop 5 and her termination were retaliatory actions taken by Defendant in response to her complaints about sex-based harassment.

Like Title VII discrimination claims, Title VII retaliation claims are analyzed under the *McDonnell Douglas* burden-shifting framework. *See McDonnell Douglas*, 411 U.S. at 802–05.

To establish a prima facie case of retaliation under Title VII, a plaintiff must show: (1) she engaged in conduct protected by Title VII; (2) after or contemporaneous with engaging in

---

[13] In addition to Plaintiff's claim failing on the merits, the Amended Complaint never once mentions "constructive discharge" and does not otherwise appear to plead constructive discharge. (*See* D.I. 5).

that conduct, her employer took an adverse action against her; (3) the adverse action was "materially adverse"; and (4) there was a causal connection between her participation in the protected activity and the adverse employment action. *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67–68 (2006); *Moore v. City of Philadelphia*, 461 F.3d 331, 340–41 (3d Cir. 2006).

### 1. Transfer to Troop 5

Plaintiff's transfer does not qualify as an adverse employment action. *See supra* Section III.B.1. Plaintiff has therefore failed to establish a prima facie case of retaliation under Title VII based on her transfer to Troop 5.

### 2. Termination

Even assuming Plaintiff has established a prima facie case of retaliation under Title VII based on her termination, she has failed to establish that Defendant's articulated rationale for her termination is pretext. *See supra* Section III.B.2. Plaintiff has therefore failed to satisfy her burden, under the *McDonnell Douglas* framework, of rebutting Defendant's proffered non-discriminatory reason.

### D. Plaintiff's DDEA Claims

"[The DDEA] prohibits employment discrimination in statutory language nearly identical to Title VII." *Spady v. Wesley Coll.*, 2010 WL 3907357, at *3 n. 4 (D. Del. Sept. 29, 2010); *see* Del. Code Ann. tit. 19, § 711(b). "[Courts] evaluate plaintiffs' DDEA claims under the same framework used to evaluate Title VII claims." *Spady*, 2010 WL 3907357, at *3 n. 4 (citing *Witcher v. Sodexho, Inc.*, 247 F. App'x 328, 329 n. 1 (3d Cir. 2007)); *see also Hyland v. Smyrna Sch. Dist.*, 608 F. App'x 79, 83 n. 5 (3d Cir. 2015) (instructing that "the standards under Title VII and the DDEA are generally the same"). Given my disposition of Plaintiff's Title VII claims, I

29

likewise grant Defendant's summary judgment on Plaintiff's DDEA claims.[14] *See supra*

Sections III.A–C.

## IV.   CONCLUSION

For the forgoing reasons, Defendant's Motion for Summary Judgment (D.I. 51) is

GRANTED.

An appropriate order will issue.

---

[14] The parties dispute whether a plaintiff can pursue both Title VII and DDEA claims in federal district court. (D.I. 52 at 20; D.I. 60 at 21). This issue appears to be an unsettled question of law. *See Phifer v. Sevenson Env't Servs., Inc.*, 619 F. App'x 153, 156 (3d Cir. 2015) ("Given that we affirm on those grounds, we need not resolve the question whether a plaintiff may proceed under both Title VII and the DDEA, a question over which district courts in this Circuit have disagreed."); *Blades v. Mosaic of Delaware*, 2017 WL 3868238, at *5 n. 5 (D. Del. Aug. 31, 2017) ("The Court considers the Title VII claims under both federal and state law, as the law is unsettled as to whether a plaintiff may proceed under Title VII, as well as the DDEA."). Given my disposition of Plaintiff's claims, I need not reach a decision on this dispute.